STATE of Wisconsin, Plaintiff-Respondent,

v.

Todd YORK, Defendant-Appellant.†

Court of Appeals

*No. 90–0901–CR. Submitted on briefs October 24, 1990.—Decided November 14, 1990.*

(Also reported in 464 N.W.2d 36.)

†Petition to review denied.

215

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Donald T. Lang,* assistant state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Donald J. Hanaway,* attorney general, and *Paul Lundsten,* assistant attorney general.

Before Cane, P.J., LaRocque and Myse, JJ.

CANE, P.J. Todd York appeals his conviction on two counts of first-degree murder, two counts of forgery and an additional escape charge. Todd contends that the trial court erred by denying his motion to suppress evidence gathered during two warrantless entries into the home of his parents, Bill and Wanda York. The trial court ruled that the first entry into the home by two investigating officers after they had been informed that Todd's parents were missing, and after one officer standing outside the home detected the odor of a decomposing body inside, was justifiable under the emergency doctrine. The court further ruled that the second entry, after the officers viewed the dead body of Bill York and called their supervisor for assistance, was also justified under the emergency doctrine because the officers sought to render aid and assistance to a potential second victim. We agree and affirm the judgment of conviction.

The facts are undisputed. On Monday, September 12, 1988, Larry Thompson, a friend of Todd's parents, called Deputy Sheriff William Campbell. Thompson expressed concern that he had been unable to contact Bill and Wanda over the preceding weekend. He told Campbell that Bill had missed business appointments on Friday and Saturday, that Wanda had missed a beauty parlor appointment on Saturday, and that both had not joined a group for their customary Sunday morning breakfast at a local restaurant. Campbell also knew Bill

217

and Wanda and considered such behavior on their part out of the ordinary. Thompson and his wife had tried repeatedly to reach Bill and Wanda by telephone over the weekend, without success.

Thompson also informed Campbell that he had seen Todd driving his mother's car on Monday morning. After his conversation with Thompson, Campbell personally observed Todd driving Wanda's car. He knew that Wanda rarely allowed Todd to use her car. Also, both Bill and Wanda had previously indicated to Campbell that they had problems with Todd, but Bill felt that he could "handle him."

Campbell discussed his concerns with Deputy Sheriff Tim Wallace and Patrolman Don Esser. Esser told Campbell that the department had been informed that Todd had been sleeping in Wanda's car at various locations in town throughout the weekend, and that someone from the department had discovered the car parked in a store's parking lot and awakened Todd.

Campbell and Wallace went together to the Yorks' home where they observed litter strewn around the backyard, consisting of beer cans and empty twelve-pack cardboard. Campbell told Wallace, "There is something seriously wrong here. I just know Bill and Wanda wouldn't allow this to be in their yard."

Campbell and Wallace knocked on the Yorks' kitchen door, located in an attached garage, and on the front door. There was no response. The officers circled the home looking in the windows, but did not observe anything out of order until they came to an open window. At that point, Campbell detected a foul odor, which he attributed to rotting tomatoes. Wallace told Campbell he believed the odor was that of a dead body.

Wallace then found a set of keys in a truck parked in an unattached garage and used one of these keys to open

the front door. The officers entered the home and encountered an odor which both knew to be that of a decomposing body. Wallace walked into the dining room where he discovered Bill's body lying on the floor. Wallace and Campbell then left the home to contact the sheriff. They did not make a call for medical assistance.

The sheriff arrived at the scene approximately ten minutes later, and all three officers again entered the home where they found Wanda's dead body lying on the kitchen floor. They conducted a brief visual search of the remaining rooms in the home, lasting no more than five minutes. The officers limited their search to viewing other rooms in the house to determine whether anyone was there. No evidence was seized during this search. The sheriff used the Yorks' telephone to contact the crime lab and then went back outside.

On review of a denial of a suppression motion, the trial court's findings of fact will be upheld unless they are clearly erroneous. Section 805.17(2), Stats. Whether those facts satisfy the constitutional requirement of reasonableness, however, presents a question of law subject to independent review. *State v. Jackson,* 147 Wis. 2d 824, 829, 434 N.W.2d 386, 388 (1989). The Wisconsin Supreme Court has delineated a two-step test to determine the validity of searches under the emergency doctrine: (1) the searching officer is actually motivated by a perceived need to render aid or assistance; and (2) a reasonable person under the circumstances would have thought an emergency existed. *State v. Prober,* 98 Wis. 2d 345, 365, 297 N.W.2d 1, 12 (1980).

With respect to the first, subjective prong of the *Prober* test, the trial court found as follows:

> In this case the officers could have and, in fact, did enter the home in the interest of preserving life, should there have been any spark of life in Mr. or Mrs. York.
>
> The court finds that the officers entered the home both times with intention of checking on the well being of the Yorks.

The court's finding that the officers involved were actually motivated by a perceived need to render aid or assistance during each of their entries into the York home is a finding of fact, to be reviewed under the clearly erroneous standard. *See State v. Kraimer,* 99 Wis. 2d 306, 317-19, 298 N.W.2d 568, 573-74 (1980).

The first entry occurred after the police were informed that friends feared for the safety of Bill and Wanda, and that Todd had been driving his mother's car, which was not generally permitted, while also sleeping in that car in parking lots throughout town. The officers observed the area surrounding the house in an unusual state of disarray.

Todd argues that Campbell acknowledged that he had once previously been summoned to the York home in 1986, when neighbors complained about a party Todd held while his parents were out of town, and that such disarray was consistent with a teenager taking advantage of his parents' absence to hold a party. Such an argument, however, ignores Campbell's testimony that Bill and Wanda were known to be people who consistently kept their appointments or cancelled them when they could not. The totality of the information available to Campbell militated against a conclusion that Bill and Wanda were on an out-of-town trip.

Additionally, Wallace identified the odor of a decomposing body emanating from an open window. While Todd's brief consistently refers to the odor per-

ceived as that of "decomposing bodies," Wallace did not so testify. If he perceived the odor of a decomposing body, knowing that two people were missing, he could reasonably have entered the York home to render assistance to the second possible victim, who could have been injured or held captive rather than dead.

Todd further contends that because the officers did not immediately attempt to break into the York home upon detecting the foul odor, they did not subjectively believe there was an emergency. We reject Todd's argument and note that Wallace attempted to gain entry through a nearby door immediately after detecting the odor. The door was locked, and there was no response to his knock. The fact that the officers attempted to discover a means of non-forcible entry into the home does not make the trial court's finding that they desired to render aid and assistance clearly erroneous.

■ With respect to the second entry, Todd argues that the fact the officers did not pursue a search for Wanda or place a call for medical assistance when they discovered Bill's body demonstrates that they were not motivated by a desire to render assistance to a second person in the home. The officers called their superior, who arrived within ten minutes. Such a short delay cannot reasonably be seen to have denied emergency aid to a potential second victim. Upon entering the house with the sheriff and discovering Wanda's body, the officers performed only a brief visual search for other victims. Again, they did not seize any evidence. The trial court's conclusion that their entries were actually motivated by a perceived need to render aid or assistance is not clearly erroneous.

■ With respect to the second, objective prong of the *Prober* test, we review the trial court's legal conclusion

that a reasonable person under the circumstances would have thought an emergency existed under the de novo standard. *Jackson,* 147 Wis. 2d at 829, 434 N.W.2d at 388. Todd relies on two cases, one from Colorado and one from Arkansas, for the proposition that the odor of a decomposing body should have informed investigating officers that no emergency existed. *Condon v. People,* 489 P.2d 1297 (Colo. 1971); *Mitchell v. State,* 742 S.W.2d 895 (Ark. 1988).

In neither case were the police dealing with a report that more than one person was missing. In fact, the *Condon* court specifically noted that "[w]e determine today that detection of an odor which might be that of a decomposing body does not create, *in and of itself,* an emergency sufficient to justify a warrantless search." *Condon,* 489 P.2d at 1299 (emphasis in original). Here, however, the odor of a decomposing body formed only part of the officers' basis for determining that the home could contain a victim in need of assistance.

Our supreme court in *Kraimer* was confronted with the issue of the application of the emergency doctrine where police were informed by an anonymous phone caller that he had shot his wife four days earlier and that he believed she was dead. When the police located the caller's home, they entered without a search warrant. The court in *Kraimer* stated:

> Frequently, the report of death proves inaccurate and a spark of life remains, sufficient to respond to emergency police aid. As a general rule, we think an emergency may be said to exist, within the meaning of the "exigency" rule, whenever the police have credible information that an unnatural death has, or may have, occurred. And, the criterion is the reasonableness of the belief of the police as to the existence of

an emergency, not the existence of an emergency in fact.

*Id.* at 328, 298 N.W.2d at 578–79 (quoting *Patrick v. State,* 227 A.2d 486, 489 (Del. 1967)).

The *Kraimer* court cited with approval the language of *State v. Epperson,* 571 S.W.2d 260 (Mo. 1978), that "apparent death may turn out to be barely surviving life, still to be saved." *Kraimer,* 99 Wis. 2d at 328, 298 N.W.2d at 579 (quoting *Epperson,* 571 S.W.2d at 264). While *Kraimer*'s holding did not directly address the issue of the applicability of the emergency doctrine where an investigating officer detects the odor of a decomposing body, that was precisely the issue confronting the Missouri court in *Epperson.* The *Epperson* court determined that where three persons were missing under very unusual circumstances, the odor of a dead body can provide grounds under the emergency doctrine to enter and search an area. *Id.* We agree.

██

We hold that where the police detect an odor of a decomposing body and they have reason to believe there might be another living victim in the area in need of assistance, an emergency exists. Because the officers' two warrantless entries into the York home were justified under the emergency doctrine, we affirm the judgment of the trial court.

*By the Court.*—Judgment affirmed.