# STATE OF CONNECTICUT *v.* MICHAEL ANGELO DEMARCO
## (AC 30152)

Bishop, DiPentima and Beach, Js.*

\* The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued February 8—officially released October 12, 2010

*Lindy R. Urso*, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Michelle Bredefeld*, deputy assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Michael Angelo DeMarco, appeals from the judgment of conviction, following his conditional plea of nolo contendere, of two counts of cruelty to animals in violation of General Statutes § 53-247 (a).[1] On appeal, the defendant claims that the trial

---

[1] The defendant was originally charged with twenty-one counts of animal cruelty, which correlated to the twenty-one beagles that were found living inside the defendant's residence.

court improperly denied his motion to suppress evidence obtained by the police pursuant to a warrantless entry into his residence. Specifically, he claims that the court improperly found that the warrantless entry was justified under the emergency doctrine exception to the warrant requirement and that the court based its finding, in part, on erroneous factual findings. We agree and, accordingly, reverse the judgment of the trial court.

The following procedural history is relevant to our review. On January 11, 2008, the defendant filed a motion to suppress all evidence seized from his premises as a result of the warrantless entry by the police on October 21, 2007. In response, the state claimed that the warrantless entry was done pursuant to an emergency and, accordingly, no warrant was required. Following a hearing, the court denied the defendant's motion to suppress on the ground that the warrantless entry by the police was permissible under the emergency doctrine exception to the warrant requirement.

In its memorandum of decision, the court, *Comerford, J.*, set forth the following facts: "Officer Tilford Cobb has been an animal control officer with the Stamford police department for the past ten years. In said capacity, he has had many contacts with the defendant as a result of neighbor complaints relating to the defendant's keeping of animals in his Wendell Place residence.

"On October 11, 2007, Officer Cobb, as a follow-up to prior complaints, left a notice on the defendant's front door and on the windshield of an automobile parked on the premises, directing the defendant to contact the animal shelter. At the time, a neighbor indicated [that] he had not seen the defendant in several days. Further, the defendant did not respond to his cell phone. Prior history indicated that he had generally responded to such notices.

"On Sunday, October 21, 2007, [Cobb], as further follow-up, paid a home visit to the defendant's residence. When approaching the house, he saw the October 11 notice on the floor of the front porch and the second notice left on the car still in place. [Cobb] observed that mail, current and dated, had piled up in an overflowing mailbox, and the same neighbor he had spoken to before once again said that he had not seen the defendant in several days. Dogs were heard barking inside the house. As he approached the front door, a strong, 'horrible odor,' which he described as a 'feces smell,' emanated from the premises. He knocked on the door, which became ajar, with no response. At the time, he did not have the defendant's cell phone number with him.

"Feeling something was wrong in the house and out of concern for the defendant's welfare and any animals in the house, [Cobb] called headquarters, resulting in a response by Sergeant Thomas Barcello, who, shortly thereafter, arrived with backup officers. Barcello, after initial discussion with [Cobb] confirmed his observations by finding the house to be in disarray, two or three vehicles on the property and overflowing and dated mail together with the previously left notices by animal control. He and his men did a perimeter check of the house and attempted to look through the windows, which were so filthy that visual observation of the interior was not possible. Patrol Officer [Will] Mercado confirmed the observations made by [Cobb] and Barcello. Out of [Cobb's] express concerns and his own findings and after consultation with [Cobb] and his officers, he, too, concluded that the defendant and possibly others, together with the animals in the house, might be in danger and need of assistance. The aforesaid observations, check of the premises and consultations all took place within a very brief period of time. Barcello concluded that a 'welfare check' was necessary. As a

result of the putrid smell emanating from the house and fear for the safety of his men, Barcello enlisted the aid of the Stamford fire department, [which] he felt had the proper breathing equipment to enter. Inspection by fire personnel disclosed no humans present but that the dogs in the house were in bad shape. It is uncontroverted that the house was in such deplorable condition at the time of the incident that shortly thereafter it was condemned by the city of Stamford.[2]

"While the defendant argues that telephone contact could have been made prior to entry, the evidence indicated otherwise, given the immediacy of the situation. [Cobb] had specifically indicated that he did not have the defendant's cell phone number with him when he made the check. Although telephone contact was made with the defendant later in the day, the evidence and the reasonable inferences therefrom indicate that this information was not available to Barcello at the time of the perceived emergency. The court specifically credits Barcello's testimony in this regard."

On July 10, 2008, following the denial of his motion to suppress, the defendant entered a plea of nolo contendere to two counts of cruelty to animals in violation of § 53-247 (a), conditioned on his right to appeal from the court's denial of his motion to suppress pursuant to General Statutes § 54-94a.[3] The court accepted the

[2] We note that while it may be factually interesting that the defendant's residence was later condemned by the city, this finding is not pertinent to whether the warrantless search of the defendant's house was justified under the emergency doctrine. Our Supreme Court has previously noted in citing a quotation attributed to William Pitt, Earl of Chatham, "The poorest man may in his cottage bid defiance to all the forces of the crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!" (Internal quotation marks omitted.) *State* v. *Geisler*, 222 Conn. 672, 687, 610 A.2d 1225 (1992).

[3] General Statutes § 54-94a provides in relevant part: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress or motion to dismiss, the defendant after the imposition

defendant's plea and determined that its denial of the motion to suppress was dispositive of the case.[4] Also on that date, the court, *Comerford, J.,* sentenced the defendant to nine months incarceration, execution suspended, and three years probation on each of the two counts, the sentences to run consecutively. This appeal followed.

We begin by setting forth the well established principles that govern the suppression of evidence derived from a warrantless entry into a home. "The fourth amendment to the United States constitution provides: The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." (Internal quotation marks omitted.) *State* v. *Geisler,* 222 Conn. 672, 681, 610 A.2d 1225 (1992). The United States Supreme Court has stated that "physical entry of the home is the chief evil against which the wording of the [f]ourth [a]mendment is directed." (Internal quotation marks omitted.) *Payton* v. *New York,* 445 U.S. 573, 585, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). Thus, "[i]t is a basic principle of [f]ourth [a]mendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." (Internal quotation marks omitted.) Id., 586. There are, however, certain recognized exceptions to the federal constitutional requirement that searches and seizures be conducted pursuant to a warrant, one exception being in cases of emergency. See *Mincey* v. *Arizona,* 437 U.S. 385, 392,

---

of sentence may file an appeal . . . provided a trial court has determined that a ruling on such motion to suppress or motion to dismiss would be dispositive of the case. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. . . ."

[4] Although the defendant's nolo contendere plea form does not indicate as such, the transcript of the sentencing hearing makes clear that the court did determine that the ruling on the defendant's motion to suppress was dispositive of the case, as required by § 54-94a.

98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978); *State* v. *Magnano*, 204 Conn. 259, 265, 528 A.2d 760 (1987). When a warrantless search has been conducted inside a home, the state bears the burden of showing that an exception to the warrant requirement exists to justify that entry. *State* v. *Geisler*, supra, 682. If none of the exceptions apply to a warrantless search, "[u]nder the exclusionary rule, [the] evidence must be suppressed [as] it is . . . the fruit of prior police illegality." (Internal quotation marks omitted.) *State* v. *Wilson*, 111 Conn. App. 614, 623, 960 A.2d 1056 (2008), cert. denied, 290 Conn. 917, 966 A.2d 234 (2009). "The requirement that a warrant be obtained before conducting a search reflects the sound policy judgment that, absent exceptional circumstances, the decision to invade the privacy of an individual's personal effects should be made by a neutral magistrate . . . . The point of the [f]ourth [a]mendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." (Internal quotation marks omitted.) *State* v. *Trine*, 37 Conn. App. 561, 567, 657 A.2d 675 (1995), rev'd on other grounds, 236 Conn. 216, 673 A.2d 1098 (1996).

The defendant claims that in denying his motion to suppress the evidence obtained by the police pursuant to their warrantless entry into his home, the court improperly concluded that the emergency doctrine applied to the circumstances of this case. Specifically, the defendant argues that the court made erroneous factual findings and that the evidence presented did not permit a finding that the police reasonably believed that a warrantless entry was necessary to help someone in

immediate need of assistance. We agree with both assertions.

"The emergency exception refers to . . . warrantless entry that evolves outside the context of a criminal investigation and does not involve probable cause as a prerequisite for the making of an arrest or the search for and seizure of evidence." (Internal quotation marks omitted.) *State* v. *Klauss*, 19 Conn. App. 296, 300, 562 A.2d 558 (1989). "[T]he fourth amendment does not bar police officers, when responding to emergencies, from making warrantless entries into premises and warrantless searches when they reasonably believe that a person within is in need of immediate aid. . . . [However], [t]he extent of the search is limited, involving 'a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises.' . . . The police may seize any evidence that is in plain view during the course of the search pursuant to the legitimate emergency activities. . . . Such a search is strictly circumscribed by the emergency which serves to justify it . . . and cannot be used to support a general exploratory search." (Citations omitted.) *State* v. *Magnano*, supra, 204 Conn. 266.

"[T]he emergency doctrine does not give the state an unrestricted invitation to enter the home. [G]iven the rationale for this very limited exception, the state actors making the search must have reason to believe that life or limb is in *immediate jeopardy* and that the intrusion is reasonably necessary to alleviate the threat." (Emphasis added; internal quotation marks omitted.) *State* v. *Geisler*, supra, 222 Conn. 691. "The state bears the burden of demonstrating that a warrantless entry falls within the emergency exception. . . . An objective test is employed to determine the reasonableness of a police officer's belief that an emergency situation necessitates a warrantless intrusion into the home. . . . [The police] must have valid reasons for the belief that

an emergency exception exists, a belief that must be grounded in empirical facts rather than subjective feelings . . . . The test is not whether the officers actually believed that an emergency existed, but whether a reasonable officer would have believed that such an emergency existed. . . . The reasonableness of a police officer's determination that an emergency exists is evaluated on the basis of facts known at the time of entry." (Citations omitted; internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 142–43, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

"[T]he emergency doctrine is rooted in the community caretaking function of the police rather than its criminal investigatory function. We acknowledge that the community caretaking function of the police is a necessary one in our society. [I]t must be recognized that the emergency doctrine serves an exceedingly useful purpose. Without it, the police would be helpless to save life and property, and could lose valuable time especially during the initial phase of a criminal investigation. . . . Constitutional guarantees of privacy and sanctions against their transgression do not exist in a vacuum but must yield to paramount concerns for human life and the legitimate need of society to protect and preserve life . . . ." (Internal quotation marks omitted.) Id., 143.

"[I]n reviewing a trial court's ruling on the emergency doctrine, subordinate factual findings will not be disturbed unless clearly erroneous and the trial court's legal conclusion regarding the applicability of the emergency doctrine in light of these facts will be reviewed de novo. . . . Conclusions drawn from [the] underlying facts must be legal and logical. . . . We must determine, therefore, whether, on the basis of the facts found by the trial court, the court properly concluded that it was objectively reasonable for the police to believe that

an emergency situation existed when they entered the [dwelling] . . . ." (Internal quotation marks omitted.) *State* v. *Fausel*, 295 Conn. 785, 793, 993 A.2d 455 (2010). Additionally, "[b]ecause the issue of the warrantless entry into a person's home involves his or her constitutional rights, a reviewing court must examine the record thoroughly to determine whether the subordinate facts justify the trial court's conclusion that the officers' belief that an emergency existed was reasonable." *State* v. *Geisler*, supra, 222 Conn. 693, citing *State* v. *Howard*, 221 Conn. 447, 454, 604 A.2d 1294 (1992) ("[b]ecause the issue . . . involves the constitutional rights of an accused, we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference . . . was reasonable").

We first review the defendant's claim that the court's factual finding, that Barcello did not have the defendant's cell phone number available to him at the time he made the decision to enter the defendant's residence, was clearly erroneous. Following a thorough review of the record, we conclude that the court's factual finding, to the extent that it implies that the defendant's cell phone number was not available to Barcello, was clearly erroneous. We recognize that the court was correct in finding that Barcello did not physically possess the defendant's cell phone number prior to entering the defendant's home. We do not, however, find support for a conclusion, implicit in this finding, that he did not have the number available to him. Cobb testified that animal control possessed the defendant's cell phone number and that they attempted to contact him at that number "in the next couple days" after leaving the notices but did not receive a return call.[5] He also testified that he did not bring the number with him on the

---

[5] It is important to note that the Stamford animal control officers, including Cobb, were considered police officers within the Stamford police department and had the power to make arrests.

day of the warrantless entry but that the number was at the animal control office and that there were other animal control employees in the office on the date in question. The only reasonable inference from this testimony is that Cobb could have readily obtained the defendant's cell phone number by calling the animal control office. Our Supreme Court has said, albeit in a different context, that when "testing the amount of evidence that supports probable cause, it is not the personal knowledge of the arresting officer, but the collective knowledge of the law enforcement organization at the time of the arrest that must be considered." *State* v. *Batts*, 281 Conn. 682, 698, 916 A.2d 788, cert. denied, 552 U.S. 1047, 128 S. Ct. 667, 169 L. Ed. 2d 524 (2007). We find this principle to be applicable equally to the circumstances presented in this case. Cobb knew about the number, the animal control department was in possession of the number and, accordingly, we conclude that the finding by the court that Barcello did not have the defendant's cell phone number available to him while he was at the defendant's residence and before he decided to order the warrantless entry was clearly erroneous.

The court based its finding that Barcello did not have the defendant's cell phone number available to him, in part, on the belief that Barcello did not have time to get the cell phone number due to "the immediacy of the situation." This finding was also clearly erroneous and is contradicted by the uncontested police testimony relating to the length of time that was spent at the residence before any authorities entered the dwelling. In short, the evidence presented to the court at the suppression hearing does not support the court's conclusion that the immediacy of the situation prevented the police from making any attempt to contact the defendant. In short, the evidence belies the suggestion that the police were confronted with a situation in

which they perceived a need to rush into a home in order to respond to a real or perceived emergency. To the contrary, the record reveals that considerable time passed between Cobb's initial arrival at the scene and the warrantless entry by the fire department. Cobb testified that he had been at the defendant's home for several minutes when he decided that something might be wrong inside the defendant's home and called the police dispatch number. Notably, Cobb did not call the emergency number. The dispatcher told Cobb that he would contact the sergeant who was on duty and, within one-half hour, Barcello arrived at the defendant's residence. After Barcello spoke with Cobb, he went to the front door, walked around the exterior of the premises and attempted to look in the windows.

At some point during Barcello's initial examination of the premises, Officer Mercado arrived, after being dispatched to assist Barcello. Mercado testified that he checked the front and back of the house and attempted to look in the windows. Mercado also testified that he spoke with Barcello and that they decided to call the fire department. Barcello, whose testimony the court specifically credited, testified that between fifteen and twenty minutes elapsed before the fire department arrived. When they did arrive, firefighters put on their breathing apparatus and entered the dwelling. Given this time line, it is plain from the record and requires no independent fact-finding from this court that from the initial arrival on the scene until firefighters entered the house, nearly one hour elapsed before the police ultimately conducted a warrantless entry into the defendant's home. Contrary to the court's conclusion, our scrupulous review of the record reveals that the police had ample time for Barcello to have obtained the defendant's cell phone number and to have attempted to contact him before entering his home. Accordingly, we conclude that the court's finding that the immediacy of

the situation prevented Barcello from attempting to contact the defendant prior to entering the home without a warrant, was clearly erroneous.

The defendant next claims that the evidence presented at the suppression hearing did not support the court's conclusion that the warrantless entry was justified under the emergency doctrine. Specifically, he claims that the evidence did not permit the court's finding that an objectively reasonable police officer would have believed that an emergency existed, such that a warrantless entry was necessary to help someone in immediate jeopardy of losing life or limb.[6] We agree.

Based solely on the facts found by the court, as corrected, we conclude that the court improperly determined that the warrantless entry by the police was permissible under the emergency exception to the warrant requirement. Although the court's memorandum of decision sets forth facts that might very well have established probable cause for a search warrant, the circumstances properly found by the court, as supported by the evidence, do not justify the warrantless entry by the police into the defendant's residence. The court found that Cobb had previously had contacts with the defendant as a result of numerous complaints from his neighbors relating to his keeping of dogs, a notice

---

[6] Neither this court nor the Supreme Court has directly addressed a claim that the emergency doctrine extends to situations in which animals are perceived by the police to be in immediate danger. The state takes the position that the doctrine does apply in regard to animals and offers support from numerous other jurisdictions that have found that the doctrine applies to animals in immediate danger. We need not answer the question in this case, however, because the court did not find that the police acted on the belief that the dogs were in peril; nor did the court base its decision on any threat to the well-being of the dogs. The police did not testify to having a belief that the animals were in immediate peril. There was, of course, testimony that the dogs were barking, that Cobb saw feces on the floor inside and that there was a terrible odor; however, and contrary to the dissent's recitation, there was no evidence that the barking was distressed or otherwise out of the ordinary.

from animal control that was left by Cobb was on the floor on the front porch when Cobb returned ten days later, there was mail overflowing from the mailbox, the defendant's neighbor had not seen him in a few days, the house smelled terribly, there were dogs barking and there were multiple vehicles parked on the premises.[7] None of these facts, either individually or cumulatively, suggests that the defendant or the dogs were in *immediate* danger or that an objectively reasonable police officer would believe that a dangerous situation existed, such that it necessitated an emergency entry.

The facts found by the court in this case are significantly dissimiliar from those present in any of the recent cases in which our Supreme Court has found warrantless searches to be justified under the emergency doctrine. In *State* v. *Colon,* supra, 272 Conn. 141–42, a warrantless search was found to be justified where the police entry stemmed from an investigation into a suspicious death of a young child. In *Colon,* the mother of the deceased child implicated the child's father in her death and the police subsequently learned that the defendant had taken the deceased's three year old sister away from her home and to her mother's apartment. Upon arriving at the apartment, the police heard someone running through the apartment and heard a child crying, and after they did not receive an answer when they knocked on the door, they entered the apartment. Our Supreme Court found that it was reasonable for

---

[7] The court also found that Cobb believed that "something was wrong in the house and out of concern for the defendant's welfare and any animals in the house, [Cobb] called headquarters," and that based on the circumstances, Barcello determined that a welfare check was necessary. These factual findings do not contribute to our analysis because the subjective belief of the police is entirely irrelevant. See *Brigham City* v. *Stuart,* 547 U.S. 398, 404, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006) ("subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the [f]ourth [a]mendment" [internal quotation marks omitted]).

the police to believe that the child may have been in physical danger.

In *State* v. *Ortiz*, 95 Conn. App. 69, 72, 895 A.2d 834, cert. denied, 280 Conn. 903, 907 A.2d 94 (2006), the police responded to a breaking and entering alarm that originated from inside an apartment in a multiple dwelling apartment building. The police knocked on the door, but got no response. Id., 73. They then used a key provided by the alarm monitoring company to enter the apartment. Id., 72. Upon entering, they noticed that the bathroom door was locked from the inside. Id. Due to their concern that somebody who had broken in was hiding in the bathroom, or that the resident of the apartment was injured, they used a screwdriver to enter the bathroom, where they found drug paraphernalia. Id., 72–73. Most recently, in *State* v. *Fausel*, supra, 295 Conn. 785, an emergency situation was found to have existed where a criminal suspect with "a history of drug and weapons offenses, engaged in dangerous, reckless and evasive driving on a major interstate highway to avoid arrest," and then "chose to hide in a house that the police officers quickly deduced was not his own, but rather the residence of three other individuals, none of whom had any apparent connection to [the suspect]." Id., 797. "None of these residents answered the police officers' shouts into the house," and, after the suspect exited the home, he failed to provide any information about the residents. Id. The court found that it was reasonable for the police to conclude that the suspect had "selected a house at random to break into and hide, thereby committing a burglary and possibly endangering the residents in the process." Id., 798.

Conversely, this case does not present any of the likely indicia of an emergency situation.[8] The police did

---

[8] "It is well established that there are an infinite variety of situations in which entry for the purpose of rendering aid is reasonable. Included are those in which entry is made . . . to seek possible victims of violence in premises apparently burglarized recently . . . ." (Internal quotation marks omitted.) *State* v. *Fausel*, supra, 295 Conn. 798.

not respond to the defendant's home as a result of an alarm, there was no evidence that a violent criminal offender might be hiding in the house, no evidence of a break-in and no signs of a struggle or blood or any other indication of a potentially dangerous situation. The justification supporting the emergency exception to the warrant requirement is that there are situations in which the police have to react to save a life, and they simply do not have the time to get a warrant before acting. See *State* v. *Krause*, 163 Conn. 76, 81, 301 A.2d 234 (1972) ("[s]ome element of emergency must exist which would render a search ineffective if delayed by the time necessary to get a warrant"). Based on the facts found by the court, we find no support for the court's conclusion that the police were faced with an immediate need to respond, such that they did not have the time to get a warrant.

Indeed, the measured behavior of the police while at the defendant's residence is stark evidence of their awareness that they were not in the midst of an emergency situation. As discussed previously, in reference to the court's erroneous factual finding that the immediacy of the situation prevented the police from obtaining the defendant's cell phone number, the record clearly demonstrates that the authorities were at the defendant's home for nearly one hour prior to entering the dwelling. To reiterate, Cobb arrived and examined the scene for several minutes before calling the nonemergency dispatch number to have someone sent to the location. Within one-half hour, Barcello arrived. He was briefed by Cobb and examined the premises. Backup police officers also arrived and examined the premises, attempting to see into the windows. Barcello next decided to call the fire department, whose members did not arrive for another fifteen or twenty minutes. This series of steps belies any claim of emergency or imminent danger and the attendant implication that the

police did not have adequate time to attempt to contact the defendant or seek a warrant before their warrantless entry of his home. Plainly, it does not evince a situation in which the police acted in a "haste to render whatever assistance was necessary . . . ."[9] (Citation omitted; internal quotation marks omitted.) *State* v. *Fausel*, supra, 295 Conn. 800, citing *State* v. *Ortiz*, supra, 95 Conn. App. 83.[10]

While we conclude that the subordinate facts found by the court do not support its finding that an objectively reasonable police officer would have believed

[9] The dissent disputes the majority's contention that the behavior of the police, and the long period of time that passed between the arrival of the police at the defendant's residence and their entry into the dwelling, did not evince any sense of immediacy. The dissent attempts to compare the facts of this case to those in *Fausel*, in which, the dissent explains, the police did not immediately enter the residence to apprehend the suspect but only did so after taking certain investigative steps, such as looking at the names on the mailbox and calling in through the front door. Thus, the dissent claims that "some" time must have passed before the police entered the dwelling.

We believe that this analysis misses the mark. In *Fausel*, the objectively reasonable belief by the police that someone inside the residence may have been in immediate need of assistance only arose *after* the suspect had voluntarily exited the building. The record reveals that after the suspect came outside, he failed to provide any information about the individuals who lived in the building, thus causing the police, at that juncture, to become concerned that the defendant may not have been hiding out with a friend, but, rather, that he may have chosen the house at random and that the occupants could have been harmed. *State* v. *Fausel*, supra, 295 Conn. 797–98. Immediately thereafter, the police entered the dwelling to conduct a search. Id., 799. Thus, we conclude that the time factor in *Fausel* provides no support for the dissent's contention that a wait of nearly one hour between arriving at the defendant's home and the warrantless entry into the home is consistent with the requirement of immediacy that is at the core of the emergency entry doctrine.

[10] In discussing the type of situations in which the police are justified in conducting a warrantless search, our Supreme Court has noted that "the question is whether the officers would have been derelict in their duty had they acted otherwise. This means, of course, that it is of no moment that it turns out there was in fact no emergency." (Internal quotation marks omitted.) *State* v. *Fausel*, supra, 295 Conn. 800. We can perceive that waiting nearly one hour to assist a person in immediate jeopardy of losing life or

that an emergency existed in this case, our own scrupulous review of the record provides additional support for our determination. We are cognizant that upon review, the court's factual findings "will not be disturbed unless [they are] clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence . . . ." (Internal quotation marks omitted.) *State* v. *Boyd*, 295 Conn. 707, 717, 992 A.2d 1071 (2010).

The court's memorandum of decision properly sets forth many of the facts that were available to the police at the time that they were deciding to make a warrantless entry into the defendant's home. We need not repeat those facts in detail, but they include the terrible odor, the overflowing mailbox and so forth. The court, however, only sets forth the facts that tend to support the conclusion that an emergency situation existed. There was, however, additional uncontroverted and unchallenged evidence presented at the suppression hearing that the court wholly disregarded in its findings. The court noted that Cobb was familiar with the defendant due to prior complaints from the defendant's neighbors regarding "his keeping of animals . . . ." The court did not acknowledge that the animal control officers, Cobb and his supervisor, Lori Hollywood, both testified without challenge that over a period of years, the defendant's neighbors had often complained of the "horrible smell coming from the house," as well as dogs

limb could be viewed as derelict. Indeed, the measured response of the police in this instance belies the notion of emergency.

barking and roaming. They also testified that they were well aware of the defendant's failure to take proper care of his many dogs. The court noted that when Cobb arrived at the residence, he knocked on the door, causing it to become ajar. The court made no mention, however, of Cobb's testimony that when the door became ajar, it enabled him to see inside the residence and to see that there were feces on the floor inside. He also testified that he saw a dog come running toward the door, so he quickly shut the door in order to keep the dog from getting outside. On the basis of this additional, uncontroverted evidence, there was not a reasonable basis for the court to have determined that the situation the police confronted was unusual for this residence and cause for an immediate emergency entry.

Further, as to the court's finding that there were two or three vehicles on the property, the court failed to note that Hollywood testified, without challenge, that she had been to the defendant's home three or four times, that she knew that he lived alone, that he owned three motor vehicles and a boat and that the property was generally in a state of disrepair. Because the record reveals uncontroverted evidence that there were always multiple cars on the premises, there was no evidentiary basis for the court's determination that the presence of the defendant's vehicle on the premises was, in any way, unusual or significant to its emergency determination.[11]

---

[11] The state relies on *State* v. *Ryder*, 114 Conn. App. 528, 539, 969 A.2d 818, cert. granted, 292 Conn. 919, 974 A.2d 723 (2009), for the proposition that the presence of a car in the driveway reasonably suggests to police that someone is home. The facts of that case, however, are distinguishable from those in this case. In *Ryder*, the police, responding to a report of a missing teenager, noted that there was a BMW convertible with its top down parked in the driveway of an upscale home that had its gated entrance closed, the garage door open, a couch sticking out of the garage onto the driveway and clothing "suitable for a teenager" visible inside a set of doors to the home. Id., 531. Those facts stand in marked contrast from those present in the case at hand, in which the uncontroverted evidence established that the police were aware on the day of their warrantless entry that the

In reaching its decision, the court also noted in its finding that animal control had not heard from the defendant since Cobb left the notices ten days prior to the warrantless search. The court did not, however, note the uncontested evidence that the defendant presented telephone records showing that he had been in contact with someone from animal control on October 12, 2007, one day after the notice had been left.[12] In regard to the court's findings that the defendant's neighbor had not seen him in several days and that the defendant had not retrieved his mail for several days, there was no evidence presented to suggest that the defendant typically saw his neighbors or that he tended to his mail. In short, given the clear evidence of the defendant's past dealings with the animal control officers, the record does not support the court's conclusion that the circumstances they observed gave them a reasonable basis to believe that an individual was in the home in need of emergency assistance at the time of their warrantless entry.

Taking all of the circumstances into account, unencumbered by the court's erroneous findings, we conclude that the court's ultimate conclusion that it was objectively reasonable for the police to believe that an emergency existed, thus, justifying a warrantless entry into the defendant's home, was not supported by substantial evidence. We do not believe that a well-trained police officer reasonably would have believed that a warrantless entry was necessary to assist a person inside the dwelling who was in need of immediate aid. Rather, the circumstances presented to the police

defendant's home was consistently in a state of disrepair and always had multiple cars parked on the premises, both in the driveway and on the front lawn.

[12] The call to the defendant was made by Katrina Wargo, the kennel maintenance person employed by animal control, for the purpose of setting up a time to meet in regard to her desire to adopt one of the defendant's puppies.

would have given them time to apply for a warrant should they have reasonably believed that probable cause existed to search the premises for evidence of the crime of cruelty to animals, given the condition of the home, as seen from the outside, coupled with the fact that dogs were at large within the residence. Entering a person's home under the guise of an emergency when none exists, and there is no objectively reasonable basis for believing that an emergency exists, is not permitted under the fourth amendment to the United States constitution.

The judgment is reversed and the case is remanded with direction to grant the defendant's motion to suppress and for further proceedings according to law.

In this opinion DiPENTIMA, J., concurred.

BEACH, J., dissenting. I respectfully dissent. I believe that the totality of the facts found by the trial court justified a warrantless entry under the emergency doctrine exception to the warrant requirement.

The trial court found the following facts. "Officer Tilford Cobb has been an animal control officer with the Stamford police department for the past ten years. In said capacity, he has had many contacts with the defendant [Michael Angelo DeMarco] as a result of neighbor complaints relating to the defendant's keeping of animals at his Wendell Place residence.

"On October 11, 2007, Officer Cobb, as a follow-up to prior complaints, left a notice on the defendant's front door and on the windshield of an automobile parked on the premises, directing the defendant to contact the animal shelter. At the time, a neighbor indicated [that] he had not seen the defendant in several days. Further, the defendant did not respond to his cell phone.

Prior history indicated that he had generally responded to such notices.

"On Sunday, October 21, 2007, [Cobb], as further follow-up, paid a home visit to the defendant's residence. When approaching the house, he saw the October 11 notice on the floor of the front porch and the second notice left on the car still in place. [Cobb] observed that mail, current and dated, had piled up in an overflowing mailbox, and the same neighbor he had spoken to before once again said that he had not seen the defendant in several days. Dogs were heard barking inside the house. As he approached the front door, a strong, 'horrible odor,' which he described as a 'feces smell,' emanated from the premises. He knocked on the door, which became ajar, with no response. At the time, he did not have the defendant's cell phone number with him.

"Feeling something was wrong in the house and out of concern for the defendant's welfare and any animals in the house, [Cobb] called headquarters, resulting in a response by Sergeant Thomas Barcello, who, shortly thereafter, arrived with backup officers. Barcello, after initial discussion with [Cobb] confirmed his observations by finding the house to be in disarray, two or three vehicles on the property and overflowing and dated mail together with the previously left notices by animal control. He and his men did a perimeter check of the house and attempted to look through the windows, which were so filthy that visual observation of the interior was not possible. Patrol Officer [Will] Mercado confirmed the observations made by [Cobb] and Barcello. Out of [Cobb's] express concerns and his own findings and after consultation with [Cobb] and his officers, he, too, concluded that the defendant and possibly others, together with the animals in the house, might be in danger and need of assistance. The aforesaid observations, check of the premises and consultations

all took place within a very brief period of time. Barcello concluded that a 'welfare check' was necessary. As a result of the putrid smell[1] emanating from the house and fear for the safety of his men, Barcello enlisted the aid of the Stamford fire department, which he felt had the proper breathing equipment to enter. Inspection by fire personnel disclosed no humans present but that the dogs in the house were in bad shape. It is uncontroverted that the house was in such deplorable condition at the time of the incident that shortly thereafter it was condemned by the city of Stamford." The trial court then stated that "[w]hile the defendant argues that telephone contact could have been made prior to entry, the evidence indicated otherwise, given the immediacy of the situation. [Cobb] had specifically indicated that he did not have the defendant's cell phone number with him when he made the check. Although telephone contact was made with the defendant later in the day, the evidence and the reasonable inferences therefrom indicate that this information was not available to Barcello at the time of the perceived emergency. The court specifically credits Barcello's testimony in this regard."

These were the only facts explicitly found by the trial court in this matter.[2] The defendant did not challenge

---

[1] The majority reports the testimony of Cobb, who stated that he had never smelled such an odor before but that he thought the odor may have been feces. Other witnesses, however, testified that they could not identify the odor. Barcello testified that the odor was of such a nature that he did not know what it was or whether or not it was a chemical odor. He also stated that he thought the odor was too pungent and too strong to be only dog feces. Mercado, another officer with the Stamford police department dispatched to assist Barcello, similarly testified that he had never smelled such an odor before. Finally, Troy Jones, the safety officer for the Glenbrook fire department, testified that he also could not identify the smell at first, so he entered the house with protective gear and a Scott monitoring meter, which identifies natural gas, carbon monoxide, methane and certain other gases. I do note, however, that the court did not expressly find anything more specific about the smell than that stated in its memorandum of decision.

[2] The record shows that neither Cobb nor Barcello had the defendant's cell phone number with him. It was apparent, however, that Cobb likely could have found the number by calling his office.

any facts found by the trial court other than the partially erroneous finding regarding the cell phone number. On the basis of these facts, I conclude that the court properly found that the entry into the defendant's home was permissible under the emergency doctrine exception to the warrant requirement.

"[I]n reviewing a trial court's ruling on the emergency doctrine, subordinate factual findings will not be disturbed unless clearly erroneous and the trial court's legal conclusion regarding the applicability of the emergency doctrine in light of these facts will be reviewed de novo. . . . Conclusions drawn from [the] underlying facts must be legal and logical. . . . We must determine, therefore, whether, *on the basis of the facts found by the trial court,* the court properly concluded that it was objectively reasonable for the police to believe that an emergency situation existed when they entered the [dwelling] . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Fausel,* 295 Conn. 785, 793, 993 A.2d 455 (2010).

"The emergency exception to the warrant requirement allows police to enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury. . . . The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. . . . As a result, the use of the emergency doctrine evolves outside the context of a criminal investigation and does not involve probable cause as a prerequisite for the making of an arrest or the search for and seizure of evidence. . . . Nevertheless, the emergency doctrine does not give the state an unrestricted invitation to enter the home. [G]iven the rationale for this very limited exception, the state actors making the search must have reason to believe that life or limb is in immediate jeopardy and that the intrusion

is reasonably necessary to alleviate the threat. . . . The police, in order to avail themselves of this exception, must have valid reasons for the belief that an emergency exists, a belief that must be grounded in empirical facts rather than subjective feelings . . . . It is an objective and not a subjective test. The test is not whether the officers actually believed that an emergency existed, but whether a reasonable officer would have believed that such an emergency existed. . . . The state bears the burden of demonstrating that a warrantless entry falls within the emergency exception." (Citations omitted; internal quotation marks omitted.) Id., 794–95.

The majority concludes that the court's findings, as corrected, are not sufficient to support the conclusion that the police reasonably believed that a warrantless entry was necessary to help someone in immediate need of assistance. I respectfully disagree.

The trial court found that the officers involved were motivated by a perceived need to render assistance to anyone, including the defendant, who might be located within the home.[3] It also found that the defendant had not responded to notices left previously by animal control officers, which behavior was out of character, mail was overflowing from the mailbox, the distressed sound of dogs could be heard, neighbors had not seen the defendant in several days and an extraordinarily foul smell was emanating from the residence. The police officers determined that the fire department, which had special breathing equipment, was better suited to investigate what condition actually existed within the house. It was thus objectively reasonable, in my opinion, for the police officers to believe, based on the facts known at the time, that an individual may well be within the

---

[3] The subjective belief of the officers is not controlling in itself.

home and in need of emergency assistance.[4] The majority, however, concludes that on these facts no reasonable police officer would believe that a dangerous situation existed, such that emergency entry was justified.

A review of the facts in a recently decided case, *State v. Fausel,* supra, 295 Conn. 785, is instructive in this matter. In *Fausel,* a police operator alerted other police of an individual, James Wayne, who was in the process of evading arrest and might be found in the area. Id., 788–89. Two detectives then noticed a vehicle of the same description backed into the driveway of a house. Id., 789. The detectives went to the front and side doors of the house and knocked but received no response. Id. The detectives then checked the mailbox, which indicated that there was mail addressed to three individuals, including the defendant, Kenneth E. Fausel, but no mail was addressed to Wayne. Id. After receiving no response from the house, the police officers then announced that a dog would be released into the house. Id. Wayne then appeared and surrendered. He refused to provide any information about whose house it was. Id. After securing Wayne, the police then did a sweep of the house to determine if anyone else was present and, in the course of such sweep, found blue bags used in the packaging of crack cocaine belonging to the defendant. Id.

---

[4] Other jurisdictions have held that similar circumstances indicated a possible emergency situation justifying a search without a warrant. See, e.g., *United States* v. *Presler,* 610 F.2d 1206, 1209 (4th Cir. 1979) (defendant's landlord had not seen him for some time, unusual odor emanating from his room); *People* v. *Molnar,* 98 N.Y.2d 328, 329, 774 N.E.2d 738, 746 N.Y.S.2d 673 (2002) (caller alerted police to " 'strange odor' " at defendant's apartment); *Rauscher* v. *State,* 129 S.W.3d 714, 717 (Tex. App. 2004) (neighbors reported not seeing defendant's wife for some time and foul, unidentified odor was emanating from home), review denied, 2004 Tex. Crim. App. LEXIS 1122 (Tex. Crim. App. July 28, 2004); *State* v. *York,* 159 Wis. 2d 215, 217, 464 N.W.2d 36 (Wis. App. 1990) (couple reported missing and foul odor, possibly decomposing body, detected), review denied, 465 N.W.2d 656 (Wis. 1991).

In that case, the police did not immediately rush into the house to apprehend Wayne. Obviously, the search around the perimeter of the house and the repeated knocking at the door took some time. In addition, the police did not enter the house until Wayne was already secured. Only after Wayne was no longer in the house did the police enter and perform a sweep. The police could have obtained a warrant for a search of the house after Wayne was secured but were not required to do so because of the potential for individuals in need of assistance in the house.[5] Apparently, the police were concerned that Wayne may have injured others in the house. Similarly, in this case, the police were not required immediately to enter the house at a risk to themselves: the facts found strongly suggest that it was reasonable to wait for the firefighters, who possessed breathing apparatus.

Under the traditional standard of review for constitutional issues—a mixed question of fact and law—the difference of opinion between the majority and me is quite straightforward. On the same set of facts, the majority holds that, viewing the situation objectively, the officers did not have reason to believe that life or limb was in danger. I believe, however, that the officers' belief was objectively reasonable.[6] The majority seeks

---

[5] See also *People* v. *Molnar*, 98 N.Y.2d 328, 335, 774 N.E.2d 738, 746 N.Y.S.2d 673 (2002) (emergency still existed notwithstanding passage of one hour between arrival of police and their entry into premises).

[6] The fact that, as it turned out, no one was in need of assistance does not detract from the responders' objectively reasonable belief. *State* v. *Ortiz*, 95 Conn. App. 69, 83, 895 A.2d 834, cert. denied, 280 Conn. 903, 907 A.2d 94 (2006). The emergency exception "must be applied by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences. As one court usefully put it, the question is whether the officers would have been derelict in their duty had they acted otherwise. This means, of course, that it is of no moment that it turns out there was in fact no emergency." (Internal quotation marks omitted.) *State* v. *Fausel*, supra, 295 Conn. 800, quoting 3 W. LaFave, Search and Seizure (4th Ed. 2004) § 6.6 (a), pp. 452–53.

to bolster its holding by adding a number of facts through the use of the "scrupulous review" standard of review. A brief excursion into the history and use of this standard of review may be useful.

The doctrine of scrupulous review in this jurisdiction appears to have its genesis in *Culombe* v. *Connecticut*, 367 U.S. 568, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961). At issue was the voluntariness of a confession, made while the defendant had been in police custody for five days. Id., 625. The Connecticut trial court had made a factual finding that the confession had been voluntary, and the conviction was upheld by the Connecticut Supreme Court of Errors. See *State* v. *Taborsky*, 147 Conn. 194, 158 A.2d 239 (1960), rev'd sub nom. *Culombe* v. *Connecticut*, 367 U.S. 568, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961).[7] The defendant Arthur Culombe petitioned the United States Supreme Court for certiorari, which was granted. *Culombe* v. *Connecticut*, 363 U.S. 826, 80 S. Ct. 1604, 4 L. Ed. 2d 1522 (1960). In the course of its majority opinion, written by Justice Frankfurter, the court discussed the appropriate standard of review. See *Culombe* v. *Connecticut*, supra, 367 U.S. 603–606. Justice Frankfurter wrote that the ascertainment of historical fact rests appropriately with the trier of fact, "subject to whatever corrective powers a State's appellate processes afford." Id., 603. All testimonial conflict, then, is decided by the state courts. If factual findings are "wholly lacking support in [the] evidence," the Supreme Court does not consider itself bound by those findings. Id. If there are no explicit factual findings, the rejection of a federal constitutional claim by a trial court applying the proper constitutional standards resolves all factual conflicts in testimony against the criminal defendant. Id., 603–604. Justice Frankfurter then stated, however, that in such a case the Supreme

---

[7] The appeals of the defendants, Arthur Culombe and Joseph "Mad Dog" Taborsky, were consolidated and the results announced in one opinion.

Court would consider "only the uncontested portions of the record: the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted." Id., 604.

The inferences from the historical facts and the legal conclusions drawn from them require a more plenary standard of review. Id., 605. "[I]t cannot be competent to the trier of fact to preclude our review simply by declining to draw inferences which the historical facts compel." Id. Even so, great weight is to be accorded to the inferences drawn by the state courts, and, in a case which is not entirely clear, the state court's determination should control. Id. The standard established by *Culombe* for the review of state court decisions on federal constitutional issues, then, is strikingly similar to our standard of mixed question of law and fact,[8] with the additional proviso that the federal authority may consider "facts," which, if not explicitly found by the trial court, are manifestly and uncontrovertibly correct. Otherwise, facts not explicitly found will be deemed to support the trier's decision, where the trier applied the appropriate standards.

For the twenty years following *Culombe*, our courts do not appear to have referred to a more exacting or "scrupulous" standard of review for constitutional claims, perhaps because the *Culombe* standard was stated as a principle to be applied to the federal review of state court decisions rather than as a standard that

---

[8] See *State* v. *Atkinson*, 235 Conn. 748, 759–60, 670 A.2d 276 (1996). Addressing the issue of whether a suspect was in custody, the court held that the standard to review historical facts was whether the facts were clearly erroneous, with the caveat that the reviewing court would undergo a "scrupulous examination of the record" to determine whether, in the totality of the circumstances, the trial court's finding was supported by "substantial evidence." Id., 759. The court's review of the conclusion reached was plenary; the court described the review as appropriate for a mixed question of law and fact. Id., 759 n.17.

state courts are mandated to use in their own appellate process. My research reveals that the first meaningful mention of scrupulous review in a Connecticut case occurs in *State* v. *Frazier*, 185 Conn. 211, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982), in which Justice Shea wrote in the context of the waiver of *Miranda*[9] rights: "The issue is factual, but our usual deference to the finding of the trial court on questions of this nature is qualified by the necessity for a scrupulous examination of the record to ascertain whether such a finding is supported by substantial evidence." Id., 219, citing *Culombe* v. *Connecticut*, supra, 367 U.S. 605. This standard has been cited, with occasional variations, to the present day. See, e.g., *State* v. *Boyd*, 295 Conn. 707, 717, 992 A.2d 1071 (2010); *State* v. *Lawrence*, 282 Conn. 141, 154, 920 A.2d 236 (2007).[10]

Though language requiring a scrupulous examination of the record appears frequently, its functional meaning is not altogether clear. In many cases, scrupulous review seems to result simply in a somewhat more searching examination than might be required under the clearly erroneous standard: if the trial court's findings are supported by "substantial evidence," they will stand. See, e.g., *State* v. *Lawrence*, supra, 282 Conn. 154–58 (not appellate court's role to retry case; here, facts supported by ample evidence in record not clearly erroneous); *State* v. *Jones*, 281 Conn. 613, 654–55, 916 A.2d 17 (even if scrupulous examination undertaken, not appellate court's role to determine credibility or retry facts but to see whether record supports finding),

[9] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[10] *State* v. *Fausel*, supra, 295 Conn. 793, referred only to the traditional clearly erroneous standard of review of historical fact and contains no mention of "scrupulous review." The omission may not be of significance, however, because the defendant in that case did not challenge the court's factual findings. Id., 793 n.5.

cert. denied, 552 U.S. 868, 128 S. Ct. 164, 169 L. Ed. 2d 112 (2007); *State* v. *Ellis*, 232 Conn. 691, 700–704, 657 A.2d 1099 (1995) (constitutional claims require scrupulous review; clearly erroneous standard apparently applied); *State* v. *Alexander*, 197 Conn. 180, 185, 496 A.2d 486 (1985) (reviewing court's customary deference to trial court fact-finding tempered by necessity for scrupulous examination of record to ascertain if finding of agency supported by substantial evidence).

At least once, our Supreme Court has undertaken a *Culombe*-like analysis and has relied on facts not explicitly found by the trial court in resolving constitutional claims. In *State* v. *Frazier*, supra, 185 Conn. 219, the issue was whether the defendant had effectively waived his constitutional rights prior to police questioning. Although the trial court did not make several findings that the Supreme Court found to be important, the Supreme Court nonetheless believed that it justifiably could resort to the police tape recording of the defendant's confession, apparently an exhibit at trial, as a source of uncontrovertible fact as to what was said during the interview; other facts that the Supreme Court held were entirely uncontradicted were relied on.[11] Id., 219–20.

---

[11] *Frazier* was decided under the findings system since abandoned by our Supreme Court. Generally, the appellant was required to submit numbered requested draft findings of fact to the trial court, the appellee was required to submit counterfindings and the trial court would then prepare numbered factual findings. It was error for a trial court not to make a requested finding of fact if the requested fact was admitted or undisputed. See, e.g., *Saphir* v. *Neustadt*, 177 Conn. 191, 197, 413 A.2d 843 (1979). In *Frazier*, the court failed to find as facts several of the defendant's requested findings of fact, which were admitted or undisputed, and the defendant was given the benefit of the doubt. *State* v. *Frazier*, supra, 185 Conn. 219–20. The findings system, then, provided a framework in which the *Culombe* analysis could be readily applied, though it appears that the *Frazier* court did not rely on the findings system alone. Some of the same purpose is served today by requests for articulation.

There likely is little practical difference between the "clearly erroneous' standard and that of "scrupulous examination." A court's "finding of fact is clearly erroneous when there is no evidence in the record to support it

The *Culombe* analysis may be summarized, then, as follows. The usual standard by which constitutional claims are reviewed is to apply the clearly erroneous standard to the historical facts, and a plenary standard to the inferences and conclusions that must be objectively reasonable. In an appropriate case, the clearly erroneous standard is tempered by an ability to consider facts not explicitly found by the trial court. The appellate court does not, however, retry the case in the sense that it does not make credibility determinations, nor does it choose between competing facts. In the absence of explicit findings, it will be assumed that the trial court believed facts supporting its conclusion, unless the uncontroverted and unassailable facts are to the contrary.

I respectfully believe that the majority in this case exceeded the permissible scope of "scrupulous review." There indeed was evidence to support many of the "facts" mentioned by the majority, but there was also evidence to support "facts," not explicitly found, which support the conclusion that an emergency existed. The hazard in performing scrupulous review, in my view, is not in rigorously testing facts found by the trial court but rather in selecting "new" facts from many, which, on the cold record, may be more or less equally credible. For example, the majority states that neighbors had complained of odors in the past but does not state that police and fire personnel perceived an odor unlike any they had perceived before. See footnote 1 of this dissenting opinion. The majority states that there frequently were a number of cars on the premises but

---

. . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Sikorsky Aircraft Corp.* v. *Commissioner of Revenue Services*, 297 Conn. 540, 568, 1 A.3d 1033 (2010). A firm conviction based on the entire evidence would seem not to be inconsistent with a conclusion reached after the exercise of scrupulous review.

does not stress that notices that had been placed about one week before were still there.[12] The majority does not stress the accumulation of mail. The majority concludes that the whole sequence of events at the scene played out over nearly one hour, enough to dispel any notion of an emergency. The trial court, on the other hand, found that the "observations, check of the premises and consultations all took place within a very brief period of time." There was evidence from which the court could have concluded that approximately fifty minutes elapsed between Cobb's arrival and the firefighters' entry, and also there was evidence that the responders' vehicles were advised to drive with emergency signals. Under the circumstances, the court thought the response was quite swift. Although scrupulous review may be appropriate to supply facts not found by the trial court if they are themselves uncontestable, an appellate court would engage in fact-finding if it were to emphasize some apparently uncontested[13] facts at the expense of others. Frequently, we are unable to discern with certainty whether the trier of fact did not believe, for some reason, facts not found, or whether they were deemed insignificant or simply not mentioned in the interest of time. If the evidence can support different conclusions and some facts are not explicitly found, *Culombe* specifically states that the facts consistent with the court's conclusions are to be used for the purpose of appellate review. *Culombe* v. *Connecticut*, supra, 367 U.S. 603–604.

The facts added by the majority pursuant to the doctrine of scrupulous review, even if appropriately added, do not significantly alter the overall situation found by

---

[12] The majority does mention testimony about a cell phone call one day after the notices were placed. Even so, the notices remained for about one week.

[13] A fact is not admitted or undisputed merely because there is no evidence to the contrary.

the trial court. The ultimate test is whether a reasonable police officer would have reason to believe that an emergency existed. This is not a criminal investigation; probable cause is not required. The safety of the community is implicated. On the facts found by the trial court, without the filtering of hindsight, it is most reasonable to believe that an emergency presented itself. Though the defendant perhaps could have been called prior to the entry, he was not called, and we ought not speculate about the result of a call not made. Further, the fact that he perhaps could have been reached does not have a substantial effect on the reasonableness of the finding of an emergency. Though multiple vehicles and unkempt premises may have been the norm, features such as accumulation of mail and a most perverse odor suggested something beyond the norm.

Finally, the majority suggests that the officers' "measured behavior" at the scene was "stark evidence" of their purported awareness that no emergency was presented. The facts found by the trial court show that the entire scenario took less than one hour on a Sunday. It presumably would have taken much longer to prepare a warrant and to have it issued. Cobb called for police help, which certainly is consistent with an emergency. It was then reasonably determined that for the safety of anyone entering the home assistance from the fire department was required, with its capacity safely to enter toxic and perhaps explosive areas. In the circumstances, "measured behavior" in coping with an emergency was not inappropriate and indeed was consistent with concern for the safety of the community and of the first responders.

This court's review of whether the facts found by the trial court, even subject to scrupulous review, support an objectively reasonable belief that an emergency existed is plenary. I would conclude that the trial court properly determined that the entry was based on an

objectively reasonable belief that an emergency existed.[14]

I would affirm the judgment of the trial court.

[14] The facts, even as set forth by the majority under its scrupulous review analysis, support, in my opinion, the conclusion that the entry was based on an objectively reasonable belief. A conclusion of reasonable belief does not require that every fact, sifted perhaps years later by a court, be consistent with that belief.