STATE OF CONNECTICUT *v.* MARY ANN LANGLEY
(AC 30792)

DiPentima, C. J., and Harper and Beach, Js.

214

Argued January 14—officially released April 26, 2011

*Stephan E. Seeger*, with whom, on the brief, was *Igor G. Kuperman*, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *David Cohen*, state's

attorney, and *Paul Ferencek*, senior assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Mary Ann Langley, appeals from the judgment of conviction, following a jury trial, of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1). On appeal, the defendant claims that the court improperly (1) denied her motion to suppress certain physical evidence recovered from the scene of the crime, (2) admitted as substantive evidence statements of the decedent victim pursuant to the excited utterance exception to the hearsay rule and (3) denied her request to instruct the jury on the lesser included offense of criminally negligent homicide in violation of General Statutes § 53a-58 (a). We disagree and, accordingly, affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant. At approximately 5 a.m. on December 14, 2006, Officers Louis Giannattasio and Jason Scanlan of the Norwalk police department were dispatched to 126 Woodward Avenue in Norwalk (residence) on reports of an " 'individual burning.' " Upon arrival, Giannattasio and Scanlan encountered the victim, James Langley (Langley), who lived together with the defendant as husband and wife at the residence. Langley was operating his motor vehicle erratically in the driveway of the residence and, when approached by Giannattasio, stated that he was burning and that he needed medical attention. Although the officers did not observe a fire at the residence at this time, when asked where he was burned, Langley lifted his shirt revealing significant burns to his torso and midsection. Shortly thereafter, Langley was treated by emergency medical personnel and physicians. He subsequently died as a result of the severity of his burns.

Later in the morning of December 14, 2006, the defendant agreed to be interviewed by Detective William Maloney of the Norwalk police department regarding her knowledge of the circumstances surrounding Langley's injuries.[1] During the course of this interview, the defendant confirmed that she and Langley were the only two people in the residence at the time he was burned. Although the defendant repeatedly denied responsibility for Langley's injuries, she contradicted herself when describing her relationship with Langley, especially with respect to an extramarital affair Langley had been having since September, 2004. For example, early in the interview the defendant suggested that she and Langley had only sporadic marital problems but later in the interview stated that Langley did "awful things to [her]," such that she "wanted to stab him." The defendant also stated that she and Langley "never fought" over his extramarital affair, although these assertions were refuted by other evidence.

The defendant subsequently was arrested and charged with murder in violation of General Statutes § 53a-54a (a). After a jury trial, the defendant was found not guilty of the murder charge but guilty of the lesser included offense of manslaughter in the first degree and sentenced to twenty years of incarceration. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly denied her motion to suppress certain physical evidence recovered from the residence. Specifically, the defendant argues that this physical evidence was obtained pursuant to repeated, unjustified warrantless entries into the residence and, as such, should have been

---

[1] This interview was recorded on a compact disc and played for the jury members during trial.

excluded under the state and federal constitutions.[2] We disagree.

The following additional facts are relevant to the disposition of this claim. After emergency medical personnel responded to the residence and transported Langley to the hospital, Giannattasio and Scanlan remained at the scene to investigate the cause of Langley's injuries. The officers proceeded to the backyard of the residence, where they encountered the defendant, and entered the residence through the back door to determine whether there was a fire inside. Upon entering the residence, Giannattasio noticed a strong odor of what he believed to be gasoline and, as such, immediately requested that fire department personnel be dispatched to the scene. As he made his way through the kitchen of the residence, Giannattasio observed, but did not touch, a single used match and a matchbook near the kitchen sink. Giannattasio also observed burnt carpeting in a bedroom of the residence, although he exited the residence to await the arrival of fire department personnel. Several minutes later, firefighters arrived at the scene, and Giannattasio reentered the residence. At this point, Giannattasio noticed a hard, nondisposable plastic cup sitting on top of a garbage bag in the kitchen of the residence that smelled strongly of gasoline. Fearing for his safety and the safety of the firefighters present in the residence, Giannattasio removed the cup and placed it outside. Nonetheless, at the behest of his superior officer, Giannattasio soon returned the cup to its original location inside the residence.

---

[2] Despite couching her claim in terms of rights afforded by both the federal and state constitutions, the defendant has not separately analyzed her claim under the state constitution. Accordingly, we will confine our review of the defendant's claim to the federal constitution. See, e.g., *State* v. *Colon*, 272 Conn. 106, 154 n.26, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

Approximately one hour after Giannattasio and Scanlan first responded to the residence, John Lomba, a fire inspector with the Norwalk fire department, arrived at the scene. After speaking briefly with the defendant as well as fire and police officials, Lomba entered the residence to check for structural damage and immediately noticed "a heavy smell of chemical or accelerant." Lomba's initial assessment confirmed fire damage to bedroom carpeting; however, "the structure [of the residence] itself was not involved in the fire." Lomba then exited the residence to wait for the arrival of Norwalk police arson detectives.

At approximately 7 a.m. on December 14, 2006, Maloney arrived at the scene. In his capacity as a Norwalk police detective, Maloney served together with Lomba on an arson "task force" comprised of members from both the Norwalk police and fire departments. After speaking with Giannattasio, Maloney questioned the defendant as to what had transpired at the residence prior to his arrival. At this time, both Maloney and Lomba secured written consent forms from the defendant to enter and to search the residence as part of a " 'cause and origin' investigation." As part of this investigation, Maloney and Lomba collected the used match, matchbook and cup originally observed by Giannattasio, as well as samples of the burnt bedroom carpet, burnt clothing and a partially melted styrofoam cup and a gallon container of acetone found near the backdoor of the residence.[3] At no time was a warrant obtained to enter or to search the residence.

On August 22, 2008, the defendant filed a motion to suppress the physical evidence seized as a result of the search of the residence. In support thereof, the defendant argued, inter alia, that the search of the residence "was illegal, in that it was undertaken without a

---

[3] For convenience purposes, the remainder of this opinion will refer to the evidence collected at the residence collectively as the "physical evidence."

warrant, and was not rooted in any legally sufficient exception to the warrant requirement," as otherwise required under the fourth amendment to the United States constitution. In response, the state countered by arguing, inter alia, that entry into the residence and seizure of the physical evidence was justified given the emergency situation present at the scene. Extensive hearings on the defendant's motion were held on September 29 and 30, 2008, during which the court heard the testimony of Giannattasio and Scanlan, as well as Lomba and Maloney. On October 3, 2008, the court issued a memorandum of decision denying the defendant's motion to suppress. In so ruling, the court agreed with the state that the warrantless entry of the residence and seizure of the physical evidence was justified by, inter alia, the "clear emergency situation" facing police and fire personnel at the residence.[4] Thereafter, the physical evidence was utilized during the state's case-in-chief to secure the defendant's conviction.

The defendant now claims that the court improperly denied her motion to suppress. Specifically, the defendant argues that the court incorrectly determined that an ongoing emergency existed at the residence such that police and fire officials could repeatedly enter the residence without a warrant and subsequently seize the physical evidence.

We begin by setting forth the well established principles that govern the suppression of evidence derived from a warrantless entry into a home. "The fourth

---

[4] In denying the defendant's motion to suppress, the court also determined that the warrantless entry into the residence and seizure of the physical evidence was justified by the defendant's valid consent and statutory authority attendant to the " 'cause and origin' " investigation conducted by Maloney and Lomba. For purposes of this appeal, however, we need address only the court's conclusion that entry into the residence and seizure of the physical evidence was valid pursuant to the "emergency exception" to the warrant requirement.

amendment to the United States constitution provides: The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." (Internal quotation marks omitted.) *State* v. *Geisler*, 222 Conn. 672, 681, 610 A.2d 1225 (1992). As the United States Supreme Court has explained, "physical entry of the home is the chief evil against which the wording of the [f]ourth [a]mendment is directed." (Internal quotation marks omitted.) *Payton* v. *New York*, 445 U.S. 573, 585, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). As such, "[i]t is a basic principle of [f]ourth [a]mendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." (Internal quotation marks omitted.) Id., 586.

When a warrantless entry and search of a home has taken place, the state bears the burden of showing that an exception to the warrant requirement exists to justify the government action. *State* v. *Geisler*, supra, 222 Conn. 682. If no such exceptions apply, "[u]nder the exclusionary rule, [the] evidence [seized as a result of the warrantless search] must be suppressed, [as] it is . . . the fruit of prior police illegality." (Internal quotation marks omitted.) *State* v. *Wilson*, 111 Conn. App. 614, 623, 960 A.2d 1056 (2008), cert. denied, 290 Conn. 917, 966 A.2d 234 (2009). "The requirement that a warrant be obtained before conducting a search reflects the sound policy judgment that, absent exceptional circumstances, the decision to invade the privacy of an individual's personal effects should be made by a neutral magistrate . . . . The point of the [f]ourth amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in

the often competitive enterprise of ferreting out crime." (Internal quotation marks omitted.) *State* v. *DeMarco*, 124 Conn. App. 438, 444, 5 A.3d 527, cert. granted, 300 Conn. 902, 12 A.3d 574 (2011).

The United States Supreme Court has recognized an exception to the warrant requirement in cases of emergency. See *Mincey* v. *Arizona*, 437 U.S. 385, 392, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978); see also *State* v. *Magnano*, 204 Conn. 259, 266, 528 A.2d 760 (1987). "The emergency exception refers to . . . warrantless entry that evolves outside the context of a criminal investigation and does not involve probable cause as a prerequisite for the making of an arrest or the search for and seizure of evidence." (Internal quotation marks omitted.) *State* v. *Klauss*, 19 Conn. App. 296, 300, 562 A.2d 558 (1989). More specifically, "the emergency doctrine is rooted in the community caretaking function of the police rather than its criminal investigatory function. We acknowledge that the community caretaking function of the police is a necessary one in our society. [I]t must be recognized that the emergency doctrine serves an exceedingly useful purpose. Without it, the police would be helpless to save life and property, and could lose valuable time especially during the initial phase of a criminal investigation. . . . Constitutional guarantees of privacy and sanctions against their transgression do not exist in a vacuum but must yield to paramount concerns for human life and the legitimate need of society to protect and preserve life . . . ." (Internal quotations marks omitted.) *State* v. *Colon*, 272 Conn. 106, 143, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

Nonetheless, "the emergency doctrine does not give the state an unrestricted invitation to enter the home. [G]iven the rationale for this very limited exception, the state actors making the search must have reason to believe that life or limb is in immediate jeopardy and

that the intrusion is reasonably necessary to alleviate the threat." (Internal quotation marks omitted.) *State v. Geisler*, supra, 222 Conn. 691. "The state bears the burden of demonstrating that a warrantless entry falls within the emergency exception. . . . An objective test is employed to determine the reasonableness of a police officer's belief that an emergency situation necessitates a warrantless intrusion into the home. . . . [The police] must have valid reasons for the belief that an emergency exception exists, a belief that must be grounded in empirical facts rather than subjective feelings . . . . The test is not whether the officers actually believed that an emergency existed, but whether a reasonable officer would have believed that such an emergency existed. . . . The reasonableness of a police officer's determination that an emergency exists is evaluated on the basis of the facts known at the time of entry." (Internal quotation marks omitted.) *State v. DeMarco*, supra, 124 Conn. App. 445–46.

Finally, we note that "[i]n reviewing a trial court's ruling on the emergency doctrine, subordinate factual findings will not be disturbed unless clearly erroneous and the trial court's legal conclusion regarding the applicability of the emergency doctrine in light of these facts will be reviewed de novo. . . . Conclusions drawn from [the] underlying facts must be legal and logical. . . . We must determine, therefore, whether, on the basis of the facts found by the trial court, the court properly concluded that it was objectively reasonable for the police to believe that an emergency situation existed when they entered the [dwelling] . . . ." (Internal quotation marks omitted.) *State v. Fausel*, 295 Conn. 785, 793, 993 A.2d 455 (2010). "Because the issue of the warrantless entry into a person's home involves his or her constitutional rights, a reviewing court must examine the record thoroughly to determine whether the subordinate facts justify the trial court's conclusion that

the officers' belief that an emergency existed was reasonable." *State* v. *Geisler*, supra, 222 Conn. 693.

In *State* v. *Eady*, 249 Conn. 431, 733 A.2d 112, cert. denied, 528 U.S. 1030, 120 S. Ct. 551, 145 L. Ed. 2d 428 (1999), our Supreme Court analyzed the applicability of the emergency exception within a factual context very similar to that of the case at bar. In *Eady*, firefighters responded to reports of a fire at the defendant's home. Id., 434. Once the fire had been suppressed, firefighters entered the defendant's home and observed what appeared to be marijuana in plain view. Id. The firefighters exited the home and informed a police officer that there was contraband inside. Id., 435. A police officer then entered the home and seized the contraband without obtaining a warrant. Id. Prior to trial, the defendant moved to suppress the evidence seized by the officer arguing that, although the firefighters lawfully could enter the home without a warrant, the subsequent warrantless entry by the police officer was unlawful. Id. In reversing the trial court's ruling granting the defendant's motion to suppress, our Supreme Court concluded that the subsequent entry by the police officer was justified under the emergency exception to the general warrant requirement. Id., 450. In so holding, the court in *Eady* explained that "when a law enforcement officer enters private premises in response to a call for help, and during the course of responding to the emergency observes but does not take into custody evidence in plain view, a subsequent entry shortly thereafter, by detectives whose duty it is to process evidence, constitutes a mere continuation of the original entry." Id, 443. As the court reasoned, "the initial lawful entry by a government agent, who was entitled to seize contraband observed in plain view . . . eliminated the defendant's reasonable expectation of privacy in the contraband and thereby permitted the subsequent entry by a second government agent to do that which the

first could have done." (Citations omitted.) Id., 444–45; see also *State* v. *Magnano*, supra, 204 Conn. 269 ("[a] search warrant is not required where evidence discovered in plain view is seized as part of a continuing police investigation" [internal quotation marks omitted]).

Here, Giannattasio and Scanlan responded to the residence on reports of an individual burning, and, once they arrived at the scene, the officers encountered Langley suffering from severe burns. Moreover, a strong odor of gasoline was emanating from the residence. The defendant does not dispute the fact that at this point Giannattasio and Scanlan were justified, pursuant to the emergency exception, to enter the residence to determine whether there was a fire inside.[5] Rather, the defendant argues that the subsequent entries into the residence by police and fire personnel were made after the emergency had been controlled and, therefore, not justified by the emergency exception. Our scrupulous review of the record, however, confirms that each item of physical evidence that was eventually seized by Maloney was in plain view of each of the government officials that entered the residence. The fact that the physical evidence was not seized by the first officers to respond to the emergency is not controlling, as the subsequent entries of the residence and seizure of the physical evidence was but a "mere continuation of the original [lawful] entry." *State* v. *Magnano*, supra, 204 Conn. 267. Because the items of physical evidence were in plain view of fire and police officials, the initial lawful entry of the residence by Giannattasio and Scanlan eliminated the defendant's reasonable expectation of privacy in

---

[5] We note that the fact that firefighters were the first to enter the defendant's home in *Eady* does not change our analysis of the present case, as the United States Supreme Court has found that the fourth amendment protection against unreasonable search and seizure extends to firefighters. See *Michigan* v. *Tyler*, 436 U.S. 499, 509–10, 98 S. Ct. 1942, 56 L. Ed. 2d 486 (1978).

the physical evidence and thereby permitted the subsequent entry by government agents to do what the first responding officers could have done—namely, seize the evidence. See *State* v. *Eady*, supra, 249 Conn. 444–45. Indeed, as was the case in *Eady*, obtaining a warrant to reenter the residence and to seize the physical evidence would have served "no beneficial purpose because the privacy interest that the warrant requirement protects already ha[d] been frustrated by the . . . plain view observation[s]" of police and fire officials. Id., 446.

To summarize, we agree with the trial court that "the entry by [police and fire] authorities . . . was attendant to a clear emergency situation" and, accordingly, the physical evidence that was in plain view was justifiably seized, notwithstanding the lack of a warrant to do so. Thus, the court properly denied the defendant's motion to suppress the physical evidence. Accordingly, the defendant's claim fails.

## II

The defendant next claims that the court improperly admitted as substantive evidence statements of Langley pursuant to the excited utterance exception to the hearsay rule. See Conn. Code Evid. § 8-3 (2). Specifically, the defendant argues that the court incorrectly determined that Langley was able to observe the startling event giving rise to his excited utterances—namely, the defendant's conduct in lighting him on fire. We are not persuaded.

The following additional facts are relevant to the resolution of this claim. Prior to the arrival of Giannattasio and Scanlan on the morning of December 14, 2006, Sheila Polite and Rodney Polite, the defendant's niece and nephew, who lived directly next door to the residence, were awakened by the sound of the defendant calling for help. Concerned for the defendant's well-being, the Polites quickly went to the residence where,

once inside, they encountered Langley, who was patting his stomach with a towel and pacing the floor of the kitchen. Rodney Polite could see that the skin over Langley's stomach appeared to be "hanging" off as if it had "melted" and the residence smelled strongly of gasoline. Also, Langley appeared to be in pain and was acting "disillusional." When asked what had happened, Rodney Polite heard Langley say that "when he woke up he was on fire." Rodney Polite also heard Langley say: "I know what happened. Ann set me on fire." Sheila Polite also heard Langley say that "he was sleeping and he watched [the defendant] pour . . . gasoline or . . . something on him" and that "[h]e watched [the defendant] pour the liquid on him and light him on fire."

During trial, the state sought to introduce as substantive evidence Langley's statements through the Polites' testimony pursuant to the excited utterance exception to the hearsay rule. The defendant objected arguing that, because Langley stated that he was sleeping prior to the defendant's allegedly incendiary behavior, there was no possible way Langley could have observed the startling event giving rise to his excited utterances, as otherwise required for the excited utterance exception to apply. Following argument, the court ruled in favor of the state, permitting both Sheila Polite and Rodney Polite to testify as to what Langley had said regarding the cause of his injuries.

"The excited utterance exception is well established. Hearsay statements, otherwise inadmissible, may be admitted into evidence to prove the truth of the matter asserted therein when (1) the declaration follows a startling occurrence, (2) the declaration refers to that occurrence, (3) the declarant observed the occurrence, and (4) the declaration is made under circumstances that negate the opportunity for deliberation and fabrication by the declarant. . . . Whether an utterance is spontaneous and made under circumstances that would

preclude contrivance and misrepresentation is a preliminary question of fact to be decided by the trial judge. . . . The trial court has broad discretion in making that factual determination, which will not be disturbed on appeal absent an unreasonable exercise of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Davis*, 109 Conn. App. 187, 193, 951 A.2d 31, cert. denied, 289 Conn. 929, 958 A.2d 160 (2008); see also Conn. Code Evid. § 8-3 (2).

"[T]he state is not required to establish such personal observation by the declarant beyond any possible doubt. Rather, the question for the trial court is whether a reasonable inference may be drawn that the declarant had personal knowledge of the facts that are the subject of his or her statement. . . . Consequently, [*d*]*irect proof of observation is not necessary*; if the circumstances appear consistent with opportunity [to observe] by the declarant, the requirement is met." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Wargo*, 255 Conn. 113, 128–29, 763 A.2d 1 (2000); see also *State* v. *Nelson*, 105 Conn. App. 393, 405, 937 A.2d 1249 ("[t]he test of whether a declarant sufficiently observed the subject of his spontaneous utterance is whether the evidence supports a finding that the declarant had an *opportunity* to observe the matters described in his or her statement" [emphasis added; internal quotation marks omitted]), cert. denied, 286 Conn. 913, 944 A.2d 983 (2008).

In the present case, the defendant challenges the third requirement for applicability of the excited utterance exception, arguing that there is no reliable evidence that Langley had the opportunity to observe the defendant's conduct in lighting him on fire because, as Langley himself stated, he was asleep at the time. We decline to interpret Langley's statements that "he was sleeping" moments before the defendant poured accelerant on his body and lit him on fire as an absolute bar to the

possibility that he had "an opportunity to observe" the defendant's conduct. *State* v. *Nelson*, supra, 105 Conn. App. 405. To the contrary, we agree with the state's position that Langley's description of what transpired reasonably can be interpreted to mean that as he was in the process of waking up, he observed the defendant "pour . . . liquid on him and light him on fire." To conclude that Langley could not possibly observe the defendant's conduct in this case would not only be disingenuous, but would also require us to blink at the reality of the stressful circumstances giving rise to Langley's statements. Such is not the test for admissibility pursuant to the excited utterance exception to the hearsay rule. "Rather, the question for the trial court is whether a *reasonable inference* may be drawn that the declarant had personal knowledge of the facts that are the subject of his or her statement." (Emphasis added.) *State* v. *Wargo*, supra, 255 Conn. 129. Here, we conclude that a reasonable inference may be drawn that Langley had the opportunity to observe the defendant's conduct, notwithstanding the defendant's argument to the contrary. As such, we cannot say that the court's decision allowing for the substantive use of Langley's statements constitutes an "unreasonable exercise of discretion." (Internal quotation marks omitted.) *State* v. *Davis*, supra, 109 Conn. App. 193. Accordingly, we reject the defendant's claim.

III

The defendant's final claim is that the court improperly denied her request to instruct the jury on the lesser included offense of criminally negligent homicide. Specifically, the defendant argues that there was sufficient evidence to justify a potential conviction of the lesser included offense and that this evidence was sufficiently in dispute to permit the jury to find her not guilty of murder or manslaughter in the first degree but guilty of criminally negligent homicide. We disagree.

The following additional facts are relevant to the defendant's claim. During trial, the prosecution's theory of the case was that the defendant intended to murder Langley primarily because of Langley's extramarital affair. Additionally, however, the state suggested that while the evidence may not show intentional murder, at a minimum, the evidence demonstrated that the defendant intended to cause Langley serious physical injury. By contrast, the defendant maintained her complete innocence throughout the proceedings.

At the close of evidence, the state requested that, in addition to a murder charge, the jury also be instructed on manslaughter in the first degree. In support of its request, the state argued that, on the basis of the evidence presented, the jury reasonably could conclude that the defendant intended either to kill Langley or to cause him serious physical injury. In response, the defendant requested that the jury also be instructed on criminally negligent homicide,[6] as the evidence "suggested that if [the] defendant did injure her husband, it was not necessarily the case that she intended to kill or seriously harm him." As posited by the defendant, "[c]onduct the jury could reasonably have attributed to the defendant included accidental, [or] criminally negligent" behavior.

On October 15, 2008, following argument by both parties, the court denied the defendant's request to charge the jury with respect to criminally negligent homicide. The court reasoned that, given the totality of evidence produced by both parties, the defendant's "request [had] no basis in the evidence whatsoever

---

[6] The defendant also requested an instruction on reckless endangerment in the second degree in violation of General Statutes § 53a-64. On appeal, however, the defendant's claim is devoted primarily to the request for an instruction on criminally negligent homicide. Therefore, we limit our analysis to the defendant's request for an instruction on criminally negligent homicide.

. . . ." More specifically, the court explained that there was simply "no evidence in the case that would relate to any kind of activity on the part of the defendant that would give rise to the jury's consideration of negligent conduct on her behalf . . . ." Thus, the court determined that the defendant was not entitled to a lesser included offense instruction under the third and fourth prongs of *State* v. *Whistnant*, 179 Conn. 576, 588, 427 A.2d 414 (1980).

It is well settled that "[t]here is no fundamental constitutional right to a jury instruction on every lesser included offense . . . . [Id., 583]. Rather, the right to such an instruction is purely a matter of our common law. A defendant is entitled to an instruction on a lesser [included] offense if, and only if, the following conditions are met: (1) an appropriate instruction is requested by either the state or the defendant; (2) it is not possible to commit the greater offense, in the manner described in the information or bill of particulars without having first committed the lesser; (3) there is some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense; and (4) the proof on the element or elements which differentiates the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater offense but guilty of the lesser." (Internal quotation marks omitted.) *State* v. *Corbin*, 260 Conn. 730, 744–45, 799 A.2d 1056 (2002) "It has been often reaffirmed that . . . criminally negligent homicide [is a] lesser included [offense] within the crime of murder." (Internal quotation marks omitted.) *State* v. *Wade*, 106 Conn. App. 467, 489–90, 942 A.2d 1085, cert. granted, 287 Conn. 908, 950 A.2d 1286 (2008) (appeal withdrawn June 12, 2008).

"In considering whether the defendant has satisfied the requirements set forth in *State* v. *Whistnant*, supra, 179 Conn. 588, we view the evidence in the light most favorable to the defendant's request for a charge on the lesser included offense. . . . On appeal, an appellate court must reverse a trial court's failure to give the requested instruction if we cannot as a matter of law exclude [the] possibility that the defendant is guilty only of the lesser offense." (Internal quotation marks omitted.) *State* v. *Corbin*, supra, 260 Conn. 745.

Here, the crux of the defendant's claim regarding the court's failure to instruct the jury on criminally negligent homicide involves the third and fourth prongs of *Whistnant*. "Despite being conceptually distinct parts of the *Whistnant* formulation, the third and fourth prongs are subject to the same evidentiary analysis. . . . [A reviewing court] will, therefore, analyze them simultaneously. The third prong of *Whistnant* requires that there [be] some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense . . . . The fourth prong requires that the proof on the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater offense but guilty of the lesser." (Citations omitted; internal quotation marks omitted.) *State* v. *Smith*, 262 Conn. 453, 468–69, 815 A.2d 1216 (2003).

To be convicted of criminally negligent homicide in violation of § 53a-58 (a), the state would have to prove beyond a reasonable doubt that the defendant acted with "criminal negligence" in causing the death of Langley. Pursuant to General Statutes § 53a-3 (14), "[a] person acts with criminal negligence with respect to a result . . . when [she] fails to perceive a substantial and unjustifiable risk that such result will occur . . . ."

(Internal quotation marks omitted.) In the present case, the evidence presented by both parties supported only one of two possible outcomes. First, when viewed from the state's perspective, the evidence supported the conclusion that the defendant intentionally poured accelerant on Langley and then lit him on fire either to cause his death or to cause him serious physical injury. Second, when viewed from the defense's perspective, the evidence supported the conclusion that the defendant was completely innocent of any wrongdoing. Thus, at the conclusion of the evidence, the jury was left to decide whether the defendant had no involvement in Langley's death or, in the alternative, caused Langley's death with intent to do so or with intent to cause him serious physical injury. At no time, either during trial or now on appeal, has the defendant proposed a situation in which, failing to "perceive [the] substantial and unjustifiable risk"; General Statutes § 53a-3 (14); of Langley's death, she poured accelerant on Langley and then lit him on fire, such that she would be guilty only of criminally negligent homicide. See *State* v. *Tomlin*, 266 Conn. 608, 631, 835 A.2d 12 (2003) ("[we] expressly [reject] the proposition that a defendant is entitled to instructions on lesser included offenses based on merely theoretical or possible scenarios" [internal quotation marks omitted]). As a corollary, "proof on the element" that differentiates criminally negligent homicide from murder and manslaughter in the first degree— namely, intent—is not "sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater offense[s] but guilty of the lesser." (Internal quotation marks omitted.) *State* v. *Smith*, supra, 262 Conn. 469. Indeed, from the evidence presented, the jury reasonably could have concluded only that the defendant either intentionally lit Langley on fire or that she had nothing to do whatsoever with Langley's injuries. Such competing theories do not revolve around the

element of intent but the defendant's culpable conduct more generally.

In sum, we conclude, as a matter of law, that the evidence excludes the possibility that the defendant would be found guilty only of criminally negligent homicide but not murder or manslaughter in the first degree. Accordingly, the defendant's claim fails.

The judgment is affirmed.

In this opinion the other judges concurred.