******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* MICHAEL
ANGELO DEMARCO
(SC 18738)

Rogers, C. J., and Palmer, Zarella, Eveleigh, Harper, Vertefeuille and
Espinosa, Js.*

*Argued October 24, 2012—officially released April 22, 2014*

*Ronald G. Weller*, senior assistant state's attorney,
with whom, on the brief, were *David I. Cohen*, state's
attorney, and *Michele Bredefeld*, deputy assistant state's
attorney, for the appellant (state).

*Lindy R. Urso*, for the appellee (defendant).

*Opinion*

EVELEIGH, J. The state appeals, following our grant of certification, from the judgment of the Appellate Court reversing the judgment of the trial court convicting the defendant, Michael Angelo DeMarco, of two counts of cruelty to animals in violation of General Statutes (Rev. to 2007) § 53-247 (a).[1] On appeal, the state claims that the Appellate Court improperly reversed the judgment of the trial court on the ground that the trial court improperly denied the defendant's motion to suppress evidence obtained during a warrantless entry into his residence.[2] Specifically, the state claims that the Appellate Court improperly applied the "scrupulous review" standard and did not give the required deference to the factual findings of the trial court. We agree and, accordingly, reverse the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following relevant facts and procedural history. "On January 11, 2008, the defendant filed a motion to suppress all evidence seized from his premises as a result of the warrantless entry by the police on October 21, 2007. In response, the state claimed that the warrantless entry was done pursuant to an emergency and, accordingly, no warrant was required. Following a hearing, the court denied the defendant's motion to suppress on the ground that the warrantless entry by the police was permissible under the emergency . . . exception to the warrant requirement.

"In its memorandum of decision, the court, *Comerford, J.*, set forth the following facts: '[Tilford Cobb] has been an [A]nimal [C]ontrol [O]fficer with the Stamford [P]olice [D]epartment for the past ten years. In said capacity, he has had many contacts with the defendant as a result of neighbor complaints relating to the defendant's keeping of animals in his [Windell] Place residence.

" 'On October 11, 2007, [Cobb], as a follow-up to prior complaints, left a notice on the defendant's front door and on the windshield of an automobile parked on the premises, directing the defendant to contact the animal shelter. At the time, a neighbor indicated [that] he had not seen the defendant in several days. Further, the defendant did not respond to his cell phone. Prior history indicated that he had generally responded to such notices.

" 'On Sunday, October 21, 2007, [Cobb], as further follow-up, paid a home visit to the defendant's residence. When approaching the house, he saw the October 11 notice on the floor of the front porch and the second notice left on the car still in place. [Cobb] observed that mail, current and dated, had piled up in an overflowing mailbox, and the same neighbor he had spoken to before once again said that he had not seen

the defendant in several days. Dogs were heard barking inside the house. As he approached the front door, a strong, "horrible odor," which he described as a "feces smell," emanated from the premises. He knocked on the door, which became ajar, with no response. At the time, he did not have the defendant's cell phone number with him.

" 'Feeling something was wrong in the house and out of concern for the defendant's welfare and any animals in the house, [Cobb] called headquarters, resulting in a response by Sergeant Thomas Barcello, who, shortly thereafter, arrived with backup officers. Barcello, after initial discussion with [Cobb], confirmed his observations by finding the house to be in disarray, two or three vehicles on the property and overflowing and dated mail together with the previously left notices by animal control. He and his men did a perimeter check of the house and attempted to look through the windows, which were so filthy that visual observation of the interior was not possible. Patrol Officer [Will] Mercado confirmed the observations made by [Cobb] and Barcello. Out of [Cobb's] express concerns and his own findings and after consultation with [Cobb] and his officers, [Barcello] too, concluded that the defendant and possibly others, together with the animals in the house, might be in danger and [in] need of assistance. The aforesaid observations, check of the premises and consultations all took place within a very brief period of time. Barcello concluded that a "welfare check" was necessary. As a result of the putrid smell emanating from the house and fear for the safety of his men, Barcello enlisted the aid of the Stamford [F]ire [D]epartment, [which] he felt had the proper breathing equipment to enter. Inspection by fire personnel disclosed no humans present but that the dogs in the house were in bad shape. It is uncontroverted that the house was in such deplorable condition at the time of the incident that shortly thereafter it was condemned by the city of Stamford.' " *State* v. *DeMarco*, 124 Conn. App. 438, 440–42, 5 A.3d 527 (2010).

The trial court further noted: " 'While the defendant argues that telephone contact could have been made prior to entry, the evidence indicated otherwise, given the immediacy of the situation. [Cobb] had specifically indicated that he did not have the defendant's cell phone number with him when he made the check. Although telephone contact was made with the defendant later in the day, the evidence and the reasonable inferences therefrom indicate that this information was not available to Barcello at the time of the perceived emergency. The court specifically credits Barcello's testimony in this regard.' " Id., 442.

"On July 10, 2008, following the denial of his motion to suppress, the defendant entered a plea of nolo contendere to two counts of cruelty to animals in violation

of § 53-247 (a), conditioned on his right to appeal from the court's denial of his motion to suppress pursuant to General Statutes § 54-94a.[3] The court accepted the defendant's plea and determined that its denial of the motion to suppress was dispositive of the case. Also on that date, the court, *Comerford, J.*, sentenced the defendant to nine months incarceration, execution suspended, and three years probation on each of the two counts, the sentences to run consecutively." (Footnotes altered.) Id., 442–43.

Thereafter, the defendant appealed from the judgment of the trial court to the Appellate Court. On appeal, the defendant claimed that the trial court improperly denied his motion to suppress evidence obtained during a warrantless entry into his residence on the ground that the warrantless entry was justified under the emergency exception to the warrant requirement. Specifically, the defendant claimed that the trial court made erroneous factual findings and that "the evidence presented did not permit a finding that the police reasonably believed that a warrantless entry was necessary to help someone in immediate need of assistance." Id., 444–45. The Appellate Court, with one judge dissenting, agreed with the defendant. Id., 458; see also footnote 2 of this opinion.

Specifically, following "a thorough review of the record," the Appellate Court concluded that the trial court's factual finding "that Barcello did not have the defendant's cell phone number available to him while he was at the defendant's residence and before he decided to order the warrantless entry was clearly erroneous." Id., 447–48. The Appellate Court also concluded that the trial court's finding that Barcello did not have time to get the defendant's cell phone number due to "the immediacy of the situation" was also clearly erroneous. (Internal quotation marks omitted.) Id., 449–50. The Appellate Court further concluded that, "[b]ased solely on the facts found by the [trial] court, *as corrected* . . . the [trial] court improperly determined that the warrantless entry by the police was permissible under the emergency exception to the warrant requirement." (Emphasis added.) Id., 450.

The Appellate Court then stated as follows: "While we conclude that the subordinate facts found by the [trial] court do not support its finding that an objectively reasonable police officer would have believed that an emergency existed in this case, our own scrupulous review of the record provides additional support for our determination. . . .

"The [trial] court's memorandum of decision properly sets forth many of the facts that were available to the police at the time that they were deciding to make a warrantless entry into the defendant's home. We need not repeat those facts in detail, but they include the terrible odor, the overflowing mailbox and so forth. The

court, however, only sets forth the facts that tend to support the conclusion that an emergency situation existed. There was, however, additional uncontroverted and unchallenged evidence presented at the suppression hearing that the court wholly disregarded in its findings." (Citation omitted.) Id., 454–55.

On the basis of the foregoing analysis, the Appellate Court concluded as follows: "Taking all of the circumstances into account, unencumbered by the court's erroneous findings, we conclude that the court's ultimate conclusion that it was objectively reasonable for the police to believe that an emergency existed, thus, justifying a warrantless entry into the defendant's home, was not supported by substantial evidence. We do not believe that a well-trained police officer reasonably would have believed that a warrantless entry was necessary to assist a person inside the dwelling who was in need of immediate aid. Rather, the circumstances presented to the police would have given them time to apply for a warrant should they have reasonably believed that probable cause existed to search the premises for evidence of the crime of cruelty to animals, given the condition of the home, as seen from the outside, coupled with the fact that dogs were at large within the residence. Entering a person's home under the guise of an emergency when none exists, and there is no objectively reasonable basis for believing that an emergency exists, is not permitted under the fourth amendment to the United States constitution." Id., 457–58. Accordingly, the Appellate Court reversed the judgment of the trial court and remanded the case to the trial court with direction to grant the defendant's motion to suppress and for further proceedings according to law. Id., 458.

We subsequently granted the state's petition for certification to appeal, limited to the following issue: "Whether the Appellate Court properly determined that the trial court improperly denied the defendant's motion to suppress?" *State* v. *DeMarco*, 300 Conn. 902, 12 A.3d 574 (2011).

We begin with the appropriate standard of review. In doing so, we acknowledge that our statements regarding the proper standard to be applied have not always been the model of clarity. We take this opportunity to clarify the appropriate standard of review for deciding whether the trial court properly denied a defendant's motion to suppress on the ground that the search violated the fourth amendment to the United States constitution. "[I]n reviewing a trial court's ruling on the emergency doctrine, subordinate factual findings will not be disturbed unless clearly erroneous and the trial court's legal conclusion regarding the applicability of the emergency doctrine in light of these facts will be reviewed de novo. . . . Conclusions drawn from [the] underlying facts must be legal and logical. . . .

We must determine, therefore, whether, on the basis of the facts found by the trial court, the court properly concluded that it was objectively reasonable for the police to believe that an emergency situation existed when they entered the [dwelling] . . . ." (Internal quotation marks omitted.) *State* v. *Ryder*, 301 Conn. 810, 820–21, 23 A.3d 694 (2011), quoting *State* v. *Fausel*, 295 Conn. 785, 793, 993 A.2d 455 (2010).

This court has further explained as follows: "A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . As we have noted previously, however, when a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [W]here the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Mullins*, 288 Conn. 345, 362–63, 952 A.2d 784 (2008).

"Notwithstanding our responsibility to examine the record scrupulously, it is well established that we may not substitute our judgment for that of the trial court when it comes to evaluating the credibility of a witness. . . . It is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony. . . . Questions of whether to believe or to disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Citations omitted; internal quotation marks omitted.) Id., 365.

On the basis of the foregoing, we acknowledge that, if, upon examination of the testimonial record, the reviewing court discovers but one version of the relevant events upon which both the state and the defendant agree, and such agreement exists both at trial and on appeal, the reviewing court may rely on that version of events in evaluating the propriety of the trial court's determinations and determining whether the trial court's factual findings are supported by substantial evidence. In a case where the trial court has concluded that the police action at issue was justified and the undisputed version of events reflected in the transcript

was adduced by the state through testimony of the police officers who were involved, a reviewing court's reliance on that version of events is particularly appropriate. If the officers' own testimony as to what occurred is internally consistent and uncontested by the defendant but, in fact, undercuts the trial court's ruling in favor of the state, a reviewing court would be remiss in failing to consider it.[4]

In the present case, even if we were to agree with the dissent and the Appellate Court that there is one undisputed version of events in the record, we disagree that the version of events culled from the officers' own testimony undercuts the trial court's ruling in favor of the state. To the contrary, we conclude that a careful examination of the facts in the present case demonstrates that there is nothing to support the conclusion that the findings were clearly erroneous. Instead, we conclude that the trial court's findings were supported by substantial evidence and that the trial court stated its rationale for its findings and reasonably reached its conclusions from the evidence presented. See id. (applying scrupulous review to trial court's decision on motion to suppress).

On appeal to this court, the state argues that, contrary to the determination of the Appellate Court, the trial court properly denied the defendant's motion to suppress because the police were authorized to enter the defendant's home without a warrant pursuant to the emergency exception to the warrant requirement. Specifically, the state asserts that the Appellate Court improperly concluded that the trial court's factual findings that the defendant's cell phone number was not available to Barcello at the time of the perceived emergency and could not have been obtained by him due to the immediacy of the situation were clearly erroneous. The state also claims that the Appellate Court improperly concluded that the factual findings of the trial court, properly viewed in the light most favorable to the trial court's ruling, supported its conclusion that an emergency existed. In response, the defendant asserts that the Appellate Court properly applied the "scrupulous review" standard and gave appropriate deference to the factual findings of the trial court. The defendant also asserts that the Appellate Court properly concluded that the trial court's finding that the defendant's cell phone number was not available to police was clearly erroneous. Further, the defendant claims that the Appellate Court properly found, or could have found, that the legal conclusion of the trial court that the warrantless entry by the police was justified was not supported by the factual findings of the trial court. We agree with the state and, accordingly, reverse the judgment of the Appellate Court.

The state first claims that the Appellate Court improperly determined that some facts found by the trial court

were clearly erroneous—namely, that Barcello did not have the defendant's cell phone number available to him at the time he made the decision to enter the defendant's residence and that Barcello did not have time to get the cell phone number due to the "immediacy of the situation." (Internal quotation marks omitted.) *State* v. *DeMarco*, supra, 124 Conn. App. 449–50. We agree.

"A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Ray*, 290 Conn. 602, 631, 966 A.2d 148 (2009).

The trial court determined as follows: "While the defendant argues that telephone contact could have been made prior to entry, the evidence indicated otherwise given the immediacy of the situation. [Cobb] had specifically indicated that he did not have the defendant's cell phone number with him when he made the check. Although telephone contact was made with the defendant later in the day, the evidence and the reasonable inferences therefrom indicate that this information was not available to Barcello at the time of the perceived emergency. The court specifically credits Barcello's testimony in this regard."

At the suppression hearing, during cross-examination by defense counsel, Barcello testified as follows:

"Q. Would you agree, then, if that was your concern that you undertook some investigation to find out whether or not for instance [the defendant] was working, to see if whether he was supposed to be in the house or out of the house?

"A. The preliminary investigation was to, and what I did, was to find out if he was around; whether he was working, whether he was visiting relatives, not specifically is he inside the house, is he home, or is he not home.

"Q. You're saying you had a specific concern that he might be in the house, correct?

"A. Yes.

"Q. Now, based on that, do you recall whether or not you undertook an investigation prior to going in, prior to deciding to go in the house to see if he was in there—

"A. Yes.

"Q. Did you undertake an investigation to find out where he might be?

"A. I think it's a two part question. On the start of the investigation to see if he was there. The specifics, whether he's there or not, I'm not sure. I'm just—I'm trying to find out if there is a person inside that house or if that person is not there. You know, have they—I believe one of the questions that I had asked one of the neighbors have you seen him and have you seen him recently, for—to let me know whether he's inside the house or not inside the house.

"Q. And you don't know whether at that point you also ascertained whether or not he was a working man?

"A. I don't know. It was a Sunday, so I wasn't—it's—to me it wasn't as critical.

"Q. And it wasn't critical for you to see if anybody had a contact number for him to try to see—find out where he was?

"A. I probably did some type of preliminary investigation, but I don't remember if I asked for his cell phone, or a relative's or whatever. I asked, which is normal course of business, to find out where—is he around, can anyone get a hold of him, and if you can't get a hold of him is he inside this house or not inside this house.

"Q. Right, and the phone call inquiry—the [cell] phone number inquiry, that's something you would have done before you made a decision to go in the house and see if he's in there?

"A. If I personally had a [cell] phone number for somebody who I believe was inside the house or not inside the house I would attempt myself to contact that person to see if they were there if I had that information in front of me.

"Q. And if you didn't have the [cell] phone number you would attempt to get the [cell] phone number before you went in, right?

"A. Probably, yes.

"Q. Before you determined that it was an absolute necessity that you go in, right?

"A. In a lot of cases, yes. It's, you know, when things are happening rather quickly you do a quick investigation and then you got to determine the safety of the person. And the quick investigation revealed that he was not there, that there was a possibility, a probability of him being in there with the mail and with the cars being parked there, and my general concern at the time is his safety or anyone else who might be in there."

On continued cross-examination, Barcello testified as follows:

"Q. And you would have done it without having ascertained, number one, whether you could have obtained [the defendant's] telephone number to call him?

"A. At that point in time I'm not sure if I had obtained the [cell] phone number or had not obtained the [cell] phone number. At the point of the decision to enter I know that I had made—I had tried to find out if he was available, if he was inside or outside or had anyone seen him, and based on, in my mind, nobody seeing him, based on mail being in the mailbox and overflowing, based on vehicles parked on the front lawn along with notices that other people had put on [there] from weeks ago I would assume that he was in there.[5]

"Q. And so—so at that point you went in not—you didn't think it was important, before you went in, to try to see if you can call inside the house?

"A. I don't know if we had a [cell] phone number at that time.

"Q. You didn't ascertain any of this is what I'm saying before you made the decision to go in?

"A. I—under normal circumstances and under routine like a routine investigation I would make those attempts before I entered somebody's personal private property. I would entertain all those avenues before I'd make the entry.

"Q. But in this case you didn't?

"A. I don't know. I don't remember if I did or did not have that information at that time. My normal course of business would be to do something like that." (Footnote added.)

On the basis of the foregoing testimony, making every reasonable presumption in favor of the trial court's ruling as we are required to do, we conclude that there was sufficient evidence in the record to support the trial court's finding that the defendant's cell phone number was unavailable to Barcello at the scene.

The state next claims that the Appellate Court improperly concluded that the trial court's finding that Barcello could not obtain the defendant's cell phone number because of the immediacy of the situation was also clearly erroneous. We disagree. The evidence also established that when Cobb arrived at the defendant's home, he knew that the defendant did not respond to two notices left at his property by animal control approximately ten days before and had not returned calls to his cell phone. Cobb considered this lack of response by the defendant to be unusual because the defendant normally responded to such notices. Upon arrival at the premises, Cobb saw the defendant's silver Honda pickup, which he knew the defendant usually drove and observed that the notices were still on the truck and on the porch. A neighbor told Cobb that he

had not seen the defendant "for several days" and mail was piling up in the mailbox and overflowing onto the ground. Cobb also noticed a "horrible smell" coming from the home, a smell which he had never smelled before. When Cobb knocked on the front door, the door became ajar and he noticed "feces all over the floor" and heard dogs barking. On the basis of those observations, Cobb called the Stamford police.

The evidence further demonstrated that when Barcello arrived, he conducted a preliminary investigation to determine the defendant's whereabouts. Barcello was unable to determine the defendant's whereabouts and, based on the facts that nobody had seen him, the mail was accumulated in the mailbox and overflowing, vehicles were parked on the front lawn, including the vehicle the defendant usually drove, and that notices that were placed there weeks ago were still in place, Barcello believed that the defendant was inside of the residence. Barcello also testified that there was a putrid smell coming from the home, which was unidentifiable, but could have been ammonia.[6]

The evidence further demonstrated that, after making these findings and conducting an initial investigation of the property, Barcello contacted the Stamford Fire Department for immediate assistance because he was unable to identify the odor emanating from the home and was worried about the safety of his officers and the community. The evidence further showed that the Stamford Fire Department responded promptly using their lights and sirens while responding and entered the dwelling quickly after arrival. A lieutenant in the Stamford Fire Department, who also responded to the defendant's home, testified that he "had not determined the cause of the odor, and [that] it could have been fatal or life threatening." The Stamford firefighters who entered the defendant's home wore protective gear and used a special monitor to determine the nature and source of the odor in order to alert them to any gases that were of an explosive nature.

On the basis of the foregoing evidence, we cannot conclude that the delays caused by the officers in investigating and then seeking backup and assistance from the Stamford Fire Department to protect their safety negate the trial court's finding that the immediacy of the situation prevented Barcello from obtaining the defendant's cell phone number. Indeed, the fact that there may have been an ammonia odor present would heighten the awareness of a police officer who would reasonably believe an emergency may exist. Also, the fact that the door was open would suggest to a reasonable officer that something was amiss in the house. Therefore, we conclude that the Appellate Court improperly concluded that the trial court's findings that Barcello did not have the defendant's cell phone number available to him at the time he made the decision to

enter the defendant's residence and that he could not obtain it because of the immediacy of the situation were clearly erroneous.

In concluding that the factual finding that Barcello did not have the defendant's cell phone number available to him at the time he made the decision to enter the defendant's residence was clearly erroneous, the Appellate Court acknowledged that Barcello did not physically possess the defendant's cell phone number prior to entering the defendant's home. *State* v. *DeMarco*, supra, 124 Conn. App. 447. Nevertheless, the Appellate Court concluded that the cell phone number was available to him because it was at the animal control office and there were other animal control employees in that office on the date in question. Id., 447–48. The Appellate Court concluded, therefore, that "Cobb could have readily obtained the defendant's cell phone number by calling the animal control office." Id., 448. The Appellate Court further used the principle applied in probable cause cases that "it is not the personal knowledge of the arresting officer, but the collective knowledge of the law enforcement organization at the time of the arrest that must be considered" in order to conclude that the trial court's finding that the cell phone number was unavailable to Barcello was clearly erroneous. (Internal quotation marks omitted.) Id., quoting *State* v. *Batts*, 281 Conn. 682, 698, 916 A.2d 788, cert. denied, 552 U.S. 1047, 128 S. Ct. 667, 169 L. Ed. 2d 524 (2007). We disagree that it is appropriate to apply the collective knowledge doctrine in the present case so as to require the police officers at the scene to contact animal control and obtain the defendant's cell phone number prior to entry.

"The emergency doctrine allows law enforcement officers to enter and secure premises without a warrant when they are responding to a perceived emergency. [*United States* v. *Cervantes*, 219 F.3d 882, 888 (9th Cir. 2000)]; see also *Mincey* v. *Arizona*, 437 U.S. 385, 392, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978) (noting that [nu]merous state and federal cases have recognized that police may respond to emergency situations without a warrant) . . . . The emergency doctrine is based on and justified by the fact that, in addition to their role as criminal investigators and law enforcers, the police also function as community caretakers. [*United States* v. *Cervantes*, supra, 889]; see also [*Mincey* v. *Arizona*, supra, 392] (noting that the [c]ourt did not question the right of the police to respond to emergency situations); *Cady* v. *Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973) (discussing the community caretaking function of police officers)." (Internal quotation marks omitted.) *United States* v. *Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005). Imposing upon law enforcement officers who are responding to an emergency situation the obligation to contact the police station and obtain information that may be contained in a police

file, or in the present case, and animal control office file, is not consistent with the purpose of the emergency exception.[7]

Indeed, the Fourth Circuit Court of Appeals rejected a similar claim where a property owner claimed that the officer should have asked the dispatcher for his home telephone number and attempted to call him before entering. In concluding that such a course of action was not constitutionally required, the Fourth Circuit reasoned as follows: "Whether in retrospect this course of action might have been preferable is not dispositive: [t]he fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable." (Internal quotation marks omitted.) *Hunsberger* v. *Wood*, 570 F.3d 546, 556 (4th Cir. 2009), cert. denied, 559 U.S. 938, 130 S. Ct. 1523, 176 L. Ed. 2d 113 (2010); see also *State* v. *Myers*, 601 P.2d 239, 245 (Alaska 1979) (rejecting respondents' claim that "officers' failure to attempt to contact the theatre owner prior to entering the building rendered the entry unreasonable"). We recognize that "the business of [police officers] and firemen is to act, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process." *Wayne* v. *United States*, 318 F.2d 205, 212 (D.C. Cir.), cert. denied, 375 U.S. 860, 84 S. Ct. 125, 11 L. Ed. 2d 86 (1963).[8]

In the present case, the trial court found that Cobb had tried to contact the defendant in the prior few weeks and had not been successful, including being unable to reach the defendant on his cell phone. Furthermore, the trial court also found that a neighbor told Cobb that he had not seen the defendant in several days and an overflowing mailbox and prior notices from animal control were visible when the officers arrived at the scene. Moreover, the trial court also found that the house was in such a filthy condition that the officers could not see through the windows and that there was a "putrid smell emanating from the house." On the basis of these findings, we decline to apply the collective knowledge doctrine to conclude that the officers were required to obtain the defendant's cell phone number from animal control and attempt to contact him prior to entering the home.[9] Accordingly, we conclude that the trial court's finding that the defendant's cell phone number was unavailable to Barcello and could not be obtained is not clearly erroneous.

Moreover, it is important to note that the dissent and the Appellate Court place great emphasis on the fact that the police officers did not attempt to contact the defendant by cell phone. Indeed, the dissent states "the warrantless search in the present case was objectively unreasonable in view of the officers' failure to make

any effort to reach the defendant on his cell phone, a call that would have obviated any possible concern about the perceived need for the warrantless intrusion into the defendant's home." We disagree. There is absolutely nothing in the evidence to support this statement. We have no idea whether the police officers would have been able to reach the defendant if they did try to call him prior to entering his residence. In fact, the evidence demonstrates that the animal control office had attempted to reach the defendant on his cell phone in the previous weeks and was unable to do so. Moreover, it is this type of speculation that we must reject when evaluating warrantless searches under the emergency doctrine. See *State* v. *LaFleur*, 307 Conn. 115, 182, 51 A.3d 1048 (2012) (*Palmer, J.*, dissenting) ("this court regularly eschews [speculation] as inherently unreliable and thus unworthy of reliance for any reason").

Having concluded that the findings of fact by the trial court were not clearly erroneous, we examine whether the trial court "properly concluded that it was objectively reasonable for the police to believe that an emergency situation existed when they entered the [dwelling]." *State* v. *Colon*, 272 Conn. 106, 142, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

"It is axiomatic that the police may not enter the home without a warrant or consent, unless one of the established exceptions to the warrant requirement is met. Indeed, [p]hysical entry of the home is the chief evil against which the wording of the fourth amendment is directed." (Internal quotation marks omitted.) *State* v. *Ryder*, supra, 301 Conn. 821; see also *Payton* v. *New York*, 445 U.S. 573, 585–86, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); *State* v. *Aviles*, 277 Conn. 281, 292, 891 A.2d 935, cert. denied, 549 U.S. 840, 127 S. Ct. 108, 166 L. Ed. 2d 69 (2006); *State* v. *Guertin*, 190 Conn. 440, 447, 461 A.2d 963 (1983).

"[I]t is clear that a search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions. . . . Searches conducted pursuant to emergency circumstances are one of the recognized exceptions to the warrant requirement under both the federal and state constitutions." (Citations omitted; internal quotation marks omitted.) *State* v. *Fausel*, supra, 295 Conn. 794. "[T]he fourth amendment does not bar police officers, when responding to emergencies, from making warrantless entries into premises and warrantless searches when they reasonably believe that a person within is in need of immediate aid. . . . The extent of the search is limited, involving a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. . . . The police may seize any evidence that is in plain view during the course of the search pursuant to the

legitimate emergency activities. . . . Such a search is strictly circumscribed by the emergency which serves to justify it . . . and cannot be used to support a general exploratory search." (Internal quotation marks omitted.) *State* v. *Geisler*, 222 Conn. 672, 691, 610 A.2d 1225 (1992).

It is well established in Connecticut that the test for the application of the doctrine is objective, not subjective, and looks to the totality of the circumstances. See *State* v. *Aviles*, supra, 277 Conn. 293; *State* v. *Guertin*, supra, 190 Conn. 453. Specifically, "the state actors making the search must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat. . . . The police, in order to avail themselves of this exception, must have valid reasons for the belief that an emergency exists, a belief that must be grounded in empirical facts rather than subjective feelings . . . . The test is not whether the officers actually believed that an emergency existed, but whether a reasonable officer would have believed that such an emergency existed." (Internal quotation marks omitted.) *State* v. *Fausel*, supra, 295 Conn. 795. "The reasonableness of a police officer's determination that an emergency exists is evaluated on the basis of facts known *at the time of entry*." (Emphasis in original; internal quotation marks omitted.) *State* v. *Blades*, 225 Conn. 609, 619, 626 A.2d 273 (1993). "[T]he emergency doctrine relies on an objective test wherein the reasonableness of the officer's belief is assessed on a case-by-case basis. . . . The three general categories that the courts have identified as justifying the application of the doctrine are danger to human life, destruction of evidence and flight of a suspect." (Citation omitted; internal quotation marks omitted.) *State* v. *Aviles*, supra, 294.

"Moreover, this court previously held that 'we do not read [prior case law] to require direct evidence of an emergency situation . . . .' *State* v. *Colon*, supra, 272 Conn. 147; see also *State* v. *Ortiz*, [95 Conn. App. 69, 83, 895 A.2d 834, cert. denied, 280 Conn. 903, 907 A.2d 94 (2006)] ('[t]he fact that a person in need of assistance was not present in the apartment does not in any way detract from the objectively reasonable interpretation of the facts that were before the police officers in their haste to render whatever assistance was necessary'); 3 W. LaFave, [Search and Seizure (4th Ed. 2004)] § 6.6 (a), pp. 452–53 (This standard 'must be applied by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences. As one court usefully put it, the question is whether "the officers would have been derelict in their duty had they acted otherwise." This means, of course, that it "is of no moment" that it turns out there was in fact no emergency.')." *State* v. *Fausel*, supra, 295 Conn. 800.

"Direct evidence of an emergency is not required because the emergency exception to the warrant requirement arises out of the caretaking function of the police. It has been observed that [t]he police have complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses; by design or default, the police are also expected to reduce the opportunities for the commission of some crimes through preventive patrol and other measures, aid individuals who are in danger of physical harm, assist those who cannot care for themselves, resolve conflict, create and maintain a feeling of security in the community, and provide other services on an emergency basis. . . . 3 W. LaFave, supra, § 6.6, p. 451. As this court previously has noted, the emergency doctrine is rooted in the community caretaking function of the police rather than its criminal investigatory function. We acknowledge that the community caretaking function of the police is a necessary one in our society. [I]t must be recognized that the emergency doctrine serves an exceedingly useful purpose. Without it, the police would be helpless to save life and property, and could lose valuable time especially during the initial phase of a criminal investigation. . . . Constitutional guarantees of privacy and sanctions against their transgression do not exist in a vacuum but must yield to paramount concerns for human life and the legitimate need of society to protect and preserve life . . . . *State* v. *Blades*, supra, 225 Conn. 619; see also *Brigham City* v. *Stuart*, [547 U.S. 398, 406, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006)] ([t]he role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties; an officer is not like a boxing [or hockey] referee, poised to stop a bout only if it becomes too one-sided)." (Internal quotation marks omitted.) *State* v. *Fausel*, supra, 295 Conn. 800–801.[10]

In the present case, the facts found by the trial court support the trial court's conclusion that, under the totality of the circumstances, a reasonable officer would have believed that an emergency existed inside the defendant's home. We briefly review the following facts contained within the record. On October 11, 2007, Cobb had visited the defendant's home, left a notice on the front door and a notice on the windshield of an automobile that the defendant typically drove, which was parked on the premises. The notice directed the defendant to contact the animal shelter. During that visit, a neighbor informed Cobb that he had not seen the defendant in several days. Further, attempts to reach the defendant by telephone at that time were unsuccessful. Despite previously responding to such notices, the defendant never responded to the notices left on October 11, 2007. Ten days later, Cobb conducted a further follow-up at the defendant's home. When he approached the defendant's home, he saw the notice that had been placed on the defendant's door on Octo-

ber 11, 2007, lying on the floor of the front porch and the other notice still on the windshield of the automobile, which the defendant typically drove. Cobb also noticed that the defendant's mailbox was overflowing with current and dated mail. The neighbor once again said he had not seen the defendant in several days. Cobb could hear dogs barking inside the house and smelled a strong, "horrible odor" emanating from the defendant's home. Cobb testified that, despite responding to the defendant's home on other occasions in response to complaints about the smell, this was a smell he had never smelled before. Cobb knocked on the door, which became ajar, and there was no response. Cobb called for backup.

Thereafter, Barcello and other officers arrived. The officers did a perimeter check of the house, noted a number of automobiles on the premises and things in disarray. The officers attempted to look in the windows, but the windows were so dirty that visual observation of the interior was not possible. After completing a preliminary investigation, Barcello determined that a person or persons could be in danger in the house and that the unidentified odor presented a safety concern. Therefore, Barcello called the Stamford Fire Department for assistance. The Stamford Fire Department responded, using their lights and sirens. Once at the scene, the firefighters were still unsure of the source and nature of the smell and thought it could be "life threatening." As a result, the firefighters utilized protective gear, including breathing apparatuses. While entering the defendant's home, the firefighters also used a special monitor to determine the nature and source of the odor in order to alert them to any gases that were of an explosive nature.

On the basis of these facts—namely, that the notices were still there after ten days, that mail was piling up, and that the same vehicles were at the premises—a police officer, reasonably would have believed that an emergency existed inside the defendant's home. Moreover, the putrid, overwhelming odor that was different than that which was present at the defendant's home on other occasions—together with the door being open—supported a finding that an emergency situation existed in connection with these other facts.[11] The concern regarding the threat to human safety relating to the pervasive overwhelming bad odor emanating from the house was amply demonstrated by the refusal of police to enter the premises and their call for support from properly equipped fire personnel.

Indeed, other courts have affirmed trial court findings that an unidentified odor, in connection with other facts, may justify police entry into the home. See, e.g., *United States* v. *Presler*, 610 F.2d 1206, 1209 (4th Cir. 1979) (defendant's landlord had not seen him for some time, unusual odor emanating from his room); *People*

v. *McGee*, 140 Ill. App. 3d 677, 681–82, 489 N.E.2d 439 (1986) (warrantless entry of residence authorized because of uncertainty of what officers would find upon entering residence based upon odor and general condition of house as seen through windows); *People* v. *Molnar*, 288 App. Div. 2d 911, 732 N.Y.S.2d 788 (2001) ("[i]t was the duty of the police here to resolve the source of the noxious odor 'suggesting harm' to the person or persons inside defendant's apartment"), aff'd, 98 N.Y.2d 328, 774 N.E.2d 738, 746 N.Y.S.2d 673 (2002); *Rauscher* v. *State*, 129 S.W.3d 714, 722 (Tex. App. 2004) (warrantless entry authorized under caretaking function due to detection of foul unidentified odor); *State* v. *York*, 159 Wis. 2d 215, 217, 464 N.W.2d 36 (App. 1990) (couple reported missing and foul odor, possibly decomposing body, detected), review denied, 465 N.W.2d 656 (Wis. 1991). Accordingly, we conclude, contrary to the Appellate Court, that the trial court properly concluded that, under the totality of the circumstances present in this case, a police officer reasonably would have believed that an emergency existed inside the defendant's home.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion HARPER, VERTEFEUILLE and ESPINOSA, Js., concurred.

* The listing of justicesa reflects their seniority status on this court as of the date of oral argument. This appeal originally was argued before a panel of this court consisting of Chief Justice Rogers and Justices Palmer, Zarella, Eveleigh and Harper. Thereafter, Justices Vertefeuille and Espinosa were added to the panel and they read the record and briefs, and listened to a recording of oral argument prior to participating in this decision.

[1] General Statutes (Rev. to 2007) § 53-247 (a) provides: "Any person who overdrives, drives when overloaded, overworks, tortures, deprives of necessary sustenance, mutilates or cruelly beats or kills or unjustifiably injures any animal, or who, having impounded or confined any animal, fails to give such animal proper care or neglects to cage or restrain any such animal from doing injury to itself or to another animal or fails to supply any such animal with wholesome air, food and water, or unjustifiably administers any poisonous or noxious drug or substance to any domestic animal or unjustifiably exposes any such drug or substance, with intent that the same shall be taken by an animal, or causes it to be done, or, having charge or custody of any animal, inflicts cruelty upon it or fails to provide it with proper food, drink or protection from the weather or abandons it or carries it or causes it to be carried in a cruel manner, or fights with or baits, harasses or worries any animal for the purpose of making it perform for amusement, diversion or exhibition, shall be fined not more than one thousand dollars or imprisoned not more than one year or both." Hereinafter, unless otherwise indicated, all references to § 53-247 (a) in this opinion are to the 2007 revision of the statute.

[2] Judge Beach dissented from the opinion of the Appellate Court, concluding that "the totality of the facts found by the trial court justified a warrantless entry under the emergency . . . exception to the warrant requirement." *State* v. *DeMarco*, 124 Conn. App. 438, 458, 5 A.3d 527 (2010).

[3] General Statutes § 54-94a provides: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law provided a trial court has determined that a ruling on such motion to suppress or motion to dismiss would be dispositive of the case. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo

contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution."

[4] We recognize that, as a general matter, merely because evidence is uncontroverted does not mean that the trial court was required to accept that evidence or give it weight in making its decision. Indeed, our model civil jury instructions explicitly instruct fact finders that "[y]ou may believe all of what a witness tells you, some of what a witness tells you, or none of what a particular witness tells you. You need not believe any particular number of witnesses and *you may reject uncontradicted testimony if you find it reasonable to do so.*" (Emphasis added.) Connecticut Civil Jury Instructions (4th Ed. 2008) instruction 2.5-1, available at http://www.jud.ct.-gov/JI/civil/part2/2.5-1.htm (last visited April 2, 2014). Likewise, our model criminal jury instructions also provide as follows: "In deciding what the facts are, you must consider all the evidence. In doing this, you must decide which testimony to believe and which testimony not to believe. You may believe all, none or any part of any witness's testimony." Connecticut Criminal Jury Instructions (4th Ed. 2008) instruction 2.4-2, available at http://www.jud.ct.gov/JI/criminal/part2/2.4-2.htm (last visited April 2, 2014).

It is well established that "[o]rdinarily the trial court has discretion to reject even uncontested evidence, on the theory that the fact finder is uniquely well situated to make determinations of witness credibility." *Willow Funding Co.*, *L.P.* v. *Grencom Associates*, 246 Conn. 615, 623, 717 A.2d 1211 (1998); see also *Gianetti* v. *Norwalk Hospital*, 266 Conn. 544, 560–61, 833 A.2d 891 (2003) (trial court was free to reject plaintiff's uncontradicted testimony); *Mather* v. *Griffin Hospital*, 207 Conn. 125, 145, 540 A.2d 666 (1988) ("[t]he [fact finder] is under no obligation to credit the evidence proffered by any witnesses . . . even if that evidence is uncontroverted" [citations omitted]); C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 6.27.8, p. 349 ("The trier of fact is entitled to believe or disbelieve any testimony. . . . The fact that certain evidence is not controverted does not mean that it must be credited." [Citation omitted.]).

[5] The dissent asserts that "if the police have ready access to the cell phone number of the person who is the object of their concern, attempting to contact that person would be among the very first things, if not *the* very first thing, that a reasonable police officer would do." (Emphasis in original.) We disagree. Although the dissent may not approve of the steps taken by the officers in the present case, it is not our role as an appellate court to dictate the appropriate steps and questions that police should use while investigating. "Whether in retrospect this course of action might have been preferable is not dispositive: [t]he fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable." (Internal quotation marks omitted.) *Hunsberger* v. *Wood*, 570 F.3d 546, 556 (4th Cir. 2009), cert. denied, 559 U.S. 938, 130 S. Ct. 1523, 176 L. Ed. 2d 113 (2010). To the extent that the dissent may not believe Barcello's testimony that he conducted a preliminary investigation pursuant to his usual routine, such credibility determinations are not appropriate for our review. Notwithstanding our responsibility to examine the record scrupulously, it is well established that we may not substitute our judgment for that of the trial court when it comes to evaluating the credibility of a witness. *State* v. *Mullins*, supra, 288 Conn. 365.

[6] Ammonia is a compound of nitrogen and hydrogen that forms "a colorless gas with a penetrating, pungent-sharp odor in small concentrations which, in heavy concentrations, produces a smothering sensation when inhaled" that "burns with a greenish-yellow flame." Van Nostrand's Encyclopedia of Chemistry (G. Considine ed., 5th Ed. Rev. 2005) pp. 82–83.

[7] The dissent states that "[t]here simply is no legitimate reason not to apply the [collective knowledge] doctrine to warrantless searches, like the one in the present case, based on a purported emergency, because it is reasonable to expect investigating officers who are working together to share important information about their investigation, provided, of course, that it is feasible to do so under the circumstances. . . . The majority's contrary conclusion is simply indefensible." We disagree. The legitimate reason not to apply the collective knowledge doctrine to a search like the one in the present case is that it takes away the ability of the police to act quickly in an emergency situation. Moreover, the cases cited by the dissent are distinguishable because in those cases the collective knowledge doctrine was used in support of allowing a search under the emergency doctrine when the knowledge of the police department as a whole supported a finding of an emergency when the emergent nature of the situation was not apparent at the scene. See *State* v. *Lemieux*, 726 N.W.2d 783, 789 (Minn. 2007) (war-

rantless search of home lawful based on collective knowledge of police department conducting investigation into homicide); *Oliver* v. *United States*, 656 A.2d 1159, 1166 n.14 (D.C. 1995) (finding warrantless search of home during kidnapping investigation lawful in part because information possessed by some officers could be imputed to officers at scene to further their belief that emergency existed that may not have been readily apparent at scene). It makes sense that we would want to support the community caretaking function of police by allowing officers to communicate information that may alert one officer responding to a situation that there may be other factors that constitute an emergency that may not be apparent to the officer who responds. On the other hand, it would frustrate the purpose of the emergency doctrine to require officers who are first responders to a scene that reasonably appears to be an emergency to contact the police department to see if there are facts known to other officers or in the department's files that negate what they see in person at the scene. Doing so may cause officers to lose valuable time. As courts have recognized in analogous situations, "[t]he reasonableness of a particular officer's actions is to be judged from the perspective of a reasonable officer at the scene, rather than with the advantage of hindsight, and allowances must be made for the fact that officers must make quick decisions under tense, uncertain, and rapidly changing circumstances." *Zayas* v. *State*, 972 S.W.2d 779, 790 (Tex. App. 1998); see also id., 789–90 (officer acted reasonably in handcuffing defendant at beginning of investigatory detention because he was sole officer, defendant did not comply with directions, and officer did not know whether other suspects were there). The other two cases cited by the dissent for this proposition can also be readily distinguished. First, the citation to *United States* v. *Russell*, 436 F.3d 1086, 1094–95 (9th Cir. 2006), is to the concurring and dissenting opinion in that case. The majority in *Russell* upheld the search on the basis that an emergency existed. Id., 1090–93. In disagreeing with the majority's conclusion, the concurring and dissenting opinion asserted that the collective knowledge doctrine should apply so as to find that no emergency existed. Id. The majority, however, did not address this issue. Accordingly, *Russell* is not useful to our analysis in the present case. Second, the quotation from *Mitchell* v. *State*, 294 Ark. 264, 270, 742 S.W.2d 895 (1988), proffered by the dissent actually comes from the court's discussion of whether there was probable cause to believe that an offense has been or is being committed within the home, not its discussion of whether an emergency situation existed so as to warrant entry into the home. Accordingly, we conclude that the dissent's reliance on this case law is misplaced.

[8] We do not intend to suggest that police officers need never attempt to contact a homeowner before making entry pursuant to the emergency exception to the warrant requirement. Such a determination necessarily must depend on the facts of the case, including the nature of previous communications with the defendant and how quickly entry must be effectuated to address the emergency. Under the facts of the present case, however, although entry was not possible immediately, it is clear that animal control had a history with the defendant and that typically the defendant responded to notices left by animal control. The fact that the defendant called animal control, unbeknownst to Cobb, the day after the first notice was left, demonstrates that Cobb's view of the defendant's conduct was correct. Therefore, the fact that the notices, which were left approximately ten days before, were still outside and seemingly ignored made it more likely that an emergency existed inside the home.

[9] Further, we note that Cobb, who had visited the house on prior occasions, described the "putrid smell" as follows:

"Q. Could you identify what type of smell it was?

"A. It was really hard to say, not a smell that I really smelled before. I could tell it may have been feces, or thought it may have been feces, but it was a strong smell mixed with an ammonia smell.

"Q. And could you identify the source at all, in particular, where the smell was coming from?

"A. Yes. I knew it was coming from the door that had opened as I knocked. I also noticed that there was feces all over the floor there . . . ."

Barcello described the odor as follows:

"Q. And what was—can you describe the odor?

"A. It was a strong pungent odor not a normal scent in the air."

Mercado described the odor as follows:

"Q. Can you describe that odor?

"A. Honestly, I can't even describe it. It's just—it's just [an] odor I have never smelt it before. It was just [a] really foul and strong stench."

Finally, Troy Jones, a firefighter with the Glenbrook Fire Department,

described the odor as follows:

"Q. And what type of odor was coming from the building?

"A. It was a pungent odor."

This testimony further supports our conclusion that there was substantial evidence in the record to support the trial judge's decision that an emergency situation was properly perceived by the police at the time of entry.

[10] The Appellate Court attempted to distinguish the facts of the present case from those in which this and other courts have found warrantless searches to be justified under the emergency doctrine on the grounds that "[t]he police did not respond to the defendant's home as a result of an alarm, there was no evidence that a violent criminal offender might be hiding in the house, no evidence of a break-in and no signs of a struggle or blood or any other indication of a potentially dangerous situation." *State* v. *DeMarco*, supra, 124 Conn. App. 452–53. As we have explained previously in this opinion, however, this court has repeatedly recognized that "[d]irect evidence of an emergency is not required because the emergency exception to the warrant requirement arises out of the caretaking function of the police." *State* v. *Fausel*, supra, 295 Conn. 800.

Similarly, the dissent claims that "the present case bears a striking resemblance to *State* v. *Vargas*, 213 N.J. 301, 63 A.3d 175 (2013), in which the New Jersey Supreme Court recently concluded on very similar facts that a search was not justified under the emergency exception to the warrant requirement." We disagree with the dissent's reliance on *Vargas*. In *Vargas*, the issue was "whether the community-caretaking doctrine authorizes the police to conduct a warrantless entry and search of a home to check on the welfare of a resident in the absence of the resident's consent or an objectively reasonable basis to believe that there is an emergency." *State* v. *Vargas*, supra, 305. The New Jersey Supreme Court ultimately concluded that the trial court properly held "that the community-caretaking doctrine standing alone, without exigent circumstances, could not justify the warrantless search of Vargas's apartment . . . ." Id., 328. It is important to note, however, that the New Jersey Supreme Court's conclusion was premised on the fact that "the state concede[d] [that] the facts in [*Vargas*] would not permit the invocation of either the exigent-circumstances or emergency-aid exceptions to the warrant requirement because no emergency spurred the police into action." Id., 312. On the basis of the state's concession in *Vargas*, the New Jersey Supreme Court's analysis in that case is of little use in the present case where the precise issue is whether the facts permit the invocation of the exigent circumstances exception to the warrant requirement.

[11] We note that the dissent bolsters its argument with reference to the amount of time it took to notify the defendant that the police were looking for him, and, thereafter, how long it took him to appear at his house. We evaluate the situation, as the trial court did, at the time the police entered the house, based upon the totality of the circumstances at that time in order to make a determination if a police officer reasonably would have believed that an emergency existed. A resort to circumstances that occurred subsequent to that time would not be prudent and would distort the analysis.